**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY, and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 8, 2015**

# In the Court of Appeals of Georgia

A15A0009. WYNN v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Anthony Wynn of armed robbery and possession of a firearm during the commission of a crime, and he was sentenced as a recidivist to life without parole plus ten years. On appeal, he argues that the evidence against him was insufficient, that the trial court erred in denying his motions for mistrial, that he was deprived of his right to a fair trial because of bad character references, that his trial counsel was ineffective for failing to object to character evidence, and that his sentence was improper. For the reasons that follow, we affirm.

1. Viewing the evidence in the light most favorable to the verdict, the record shows that on June 29, 2007, the victim, who worked for Cash America Pawn, noticed a man standing and staring at her while she waited in line at a local bank to cash a $3,000 check for the store. She called her manager as she was leaving the bank, and he was watching the back parking lot when he saw her pull in, followed by

a black Jeep that came up fast and parked behind her. The manager immediately called 911 and watched as a man got out of the Jeep, pointed a gun at the victim, took the bank money bag from her, and got back in the Jeep, which left. The manager gave the 911 operator details about the robber's clothing, the gun, the vehicle, which had no license tag, and the vehicle's direction of travel. The victim subsequently described the robber's clothes to the responding officers, describing his hat as dark with some orange on it.

An officer responded to the dispatch about an armed robbery by parking his vehicle in the turn lane of the road facing the direction where the robbers were reportedly heading. He saw a black Jeep come toward him and began to follow it, but the windows were tinted dark and the vehicle had a license tag, so the officer was not sure if he was following the robbers or not. The Jeep's driver pulled into a convenience store lot, paused by the gas pumps, then parked by the front door. Two men got out, neither of whom matched the description of the robber, and went into the store. The officer ran the tag and waited for backup rather than follow the men inside, but blocked the Jeep with his patrol car. Just before backup arrived, a third man who matched the robber's description got out of the Jeep and also went into the store. The officer waited until the man, later identified as Sanchez Jones, came out of

2

the store and began to walk away and then arrested him, but by the time the officers searched the store the two men who had gone inside earlier had left through a side door. A K9 officer and his dog tracked the two men for some distance but did not catch them.

Back at the convenience store, the officers saw that the license tag on the Jeep was creased along its top edge, which indicated it had been bent upward as if to conceal the tag numbers. At the police station, Jones waived his *Miranda* rights and confessed that he had robbed the victim, identifying the other two men involved as "Ant" and "Poochy." Jones's cell phone included contact numbers for Ant and "P," who Jones said was Poochy, and showed that Ant and Jones had exchanged calls earlier that day.

The next day the granddaughter of the black Jeep's owner came to the police station and told the detective that she had loaned the black Jeep to Wynn, known as "Ant," the day before. She explained that she had lied to the detective the day before when he called to ask if she knew Jones because she had been stuck at Wynn's house without her vehicle and had been afraid to say anything. She said that Jones was her boyfriend and worked for Wynn in Wynn's lawn care business, that her relative lived across the street from Wynn, and that she agreed to exchange vehicles with Wynn the

3

day of the robbery because Wynn said he needed to use the trailer hitch on the black Jeep. She left the black Jeep with Wynn and drove away in his blue Jeep. Later that day, Wynn called the neighbor and asked her to call the woman who had loaned him the black Jeep and tell her to report it stolen. When the neighbor asked Wynn where he was, he said "I'm in the woods. But Sanchez was slow about getting out [of] the car, so he got caught."

When the woman who lent Wynn her black Jeep called him back, he told her something had happened and asked her to come pick him up. She met him in a store parking lot and drove him home in the blue Jeep he had loaned her. Wynn detained the woman for a time but eventually let her leave in another car that belonged to Wynn. The next day the woman drove Wynn's car to the police station to talk to the lead detective, who took her statement, confiscated that car, and then drove her to the impound lot where she retrieved her black Jeep. A crime scene technician testified that when he executed a search warrant on the black Jeep, he found a bank bag containing $3,000 in five- and twenty-dollar bills, two pistols, sunglasses, a denim ball cap with orange stitching, other clothes, a prescription bottle with the name Timothy Wynn on the label, and a cell phone. The magazines of both pistols were fully loaded and one of them had a bullet in the chamber. The detective obtained a

4

search warrant for the cell phone found in the black Jeep and eventually identified its owner, who testified that the phone had been stolen from his car at a gas station on the day of the robbery.

Sanchez Jones pled guilty to one count of armed robbery and one count of possession of a firearm during the commission of a crime, and testified that he was the one who robbed the victim using his loaded, cocked .40 caliber handgun, which had been recovered from the black Jeep. Wynn had been driving the car, and it was Wynn's idea to go to the bank but both of them had the idea to rob someone. Wynne went into the bank for a while, came out, and said, "I got one," then followed the victim to the pawn store parking lot. As Jones got out to rob the victim, Wynn said, "Go get her." When asked why he put a gun to the victim, Jones replied, "Because it were [sic] my turn." He identified the other gun recovered from the black Jeep as belonging to Wynn.

After notice and a hearing, the trial court allowed the State to introduce similar transaction evidence that Wynn committed a similar robbery a month later, in July 2007, and was arrested in August 2007 after a stakeout at another bank led to a lengthy chase and apprehension. The July 2007 robbery victim testified that as she left the bank with a bank bag containing cash, one man signaled another who then

5

pushed her up against her car and took her money bag. The two men then ran away, and the victim later identified Wynn in a photographic lineup as the man who robbed her.

Six officers from the Forest Park Police Department testified regarding the chase that ultimately led to Wynn's arrest on August 2, 2007. The officers were conducting a surveillance operation on two different bank branches that day after receiving reports of people being followed from the banks and having money stolen from their vehicles. There was also an arrest warrant out for Wynn and the officers were looking for a man matching Wynn's description and driving a blue Jeep. An undercover officer saw Wynn get out of a blue Jeep in a bank parking lot and alerted the uniformed patrol officers, who pulled into the lot. Wynn drove out of the lot and the officers unsuccessfully attempted a traffic stop. Wynn eventually drove into a cul-de-sac and fled his car, leading to a foot chase that finally ended after an officer subdued Wynn with a Taser and then grappled with him until backup arrived and secured him.

1. Wynn contends that the circumstantial evidence presented was insufficient for a rational jury to find him guilty of armed robbery and possession of a weapon during the commission of a crime, arguing that the State presented only the testimony

of a co-defendant, corroborated "only" by the co-defendant's girlfriend and similar transaction evidence, thus failing to prove he was "an accessory before the fact." That corroboration would be sufficient, but the State also presented the testimony of Wynn's neighbor about Wynn's incriminating phone call on the day of the robbery, during which he said that he was in the woods and Jones had been caught because he was too slow. The evidence was sufficient under the standards of *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See *Alatise v. State*, 291 Ga. 428, 432 (5) (728 SE2d 592) (2012).

2. In two separate enumerations of error, Wynn contends that the trial court erred in denying his motions for mistrial after witnesses for the State improperly injected bad character evidence three times, and erred in denying his motion for new trial on that and due process grounds.

The trial court gave curative instructions twice after witnesses interjected bad character evidence. The first set of curative instructions covered two incidents. In the first, the lead detective in the current case said on redirect examination that the DeKalb County police had been investigating Wynn for another crime, after Wynn brought out in cross-examination that the detective had not spoken directly to Wynn's neighbor, but had talked to DeKalb County police officers about the neighbor's

7

statements. The court held an unreported sidebar at that time, and Wynn subsequently perfected the record regarding the substance of that sidebar, which addressed his first motion for mistrial. Wynn moved for a mistrial again after a Forest Park police officer testified that after Wynn was arrested, he waived his *Miranda* rights and said the police were "always accusing him of committing crimes because of his past criminal history."

The trial court denied the motions for mistrial. As to the detective's answer about DeKalb County crimes, the court noted that Wynn's neighbor had previously testified about the matter and thus the evidence was cumulative. The court denied the motion for mistrial as to the Forest Park officer's testimony because it was not directly responsive to the question asked and because the officer was describing Wynn's voluntary, admissible statement, but gave extensive curative instructions to the jury. The court explained that Wynn was on trial only for the armed robbery and firearm possession charges in the indictment, that the similar transaction evidence should be considered only to the extent it might show identity, state of mind, knowledge, or intent, and that any references to other investigations were totally irrelevant.

The next motion for mistrial came after a detective sergeant with the Forest Park Police Department who was explaining his role in the similar transaction investigation said, "I had a prior case with Mr. Wynn where he was involved in a theft in the city of Forest Park." Wynn objected and moved for a mistrial after the trial court sent the jury out. After the witness made a proffer about why he brought up the prior theft, the trial court held that the statement was arguably admissible to explain the detective's conduct but that its prejudicial nature outweighed its benefit. The court thus denied the motion for mistrial, sustained the objection, and instructed the jury again that they were there to focus on the current charges and were to consider the Forest Park similar transaction only for the limited purposes stated, and were to disregard other aspects of the investigation relating to other occurrences.

The State contends that Wynn waived his right to assert error on appeal for failing to move for mistrial contemporaneously in the first instance and failing to renew his motion for mistrial following the trial court's curative instructions. It is generally true that to preserve appellate review of the denial of a motion for mistrial, the motion must be renewed following curative instructions or the issue is waived. The reasoning behind the waiver rule is because "[i]f the trial court's curative instructions are not sufficient, defendant should seek additional relief." (Citation

9

omitted.) *Stubbs v. State*, 315 Ga. App. 482, 484 (2) (727 SE2d 229) (2012). In *Stubbs*, however, the defendant specifically approved of the curative instructions to be given and did not renew his motion for mistrial afterward, and thus waived appellate review. In contrast, here the trial court specifically stated on the record on both occasions that Wynn was excepting to the denial of his motion for mistrial and was not waiving it by his response when the court asked if he had suggestions for the proposed curative instructions. Thus the issue was not waived.

Considering the merits of Wynn's enumeration of error, we note that "[w]hether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Ottis v. State*, 271 Ga. 200, 201 (3) (517 SE2d 525) (1999). When determining whether the trial court abused its discretion, we consider the statement itself, other evidence against the accused, and the actions of the trial court and counsel dealing with the impropriety. *Martin v. State*, 240 Ga. App. 901, 902 (1) (525 SE2d 728) (1999). Considering all of these factors, we conclude that the trial court did not abuse its discretion in denying Wynn's motion for mistrial.

3. Wynn contends that these and other bad character references during the trial violated his due process right to a fair trial. For example, the owner of the black Jeep testified that Wynn was caught in another armed robbery case, after which the State redirected her responses by confirming that "this [was] the only robbery [she had] information on." The State then asked if she felt safer once she knew he was caught, and when she answered no, the State asked why not. The witness responded, "Because I knew his entourage he — those are the people that he had to do his work." Wynn objected, the trial court sustained the objection, then in response to a question about whether she knew if Wynn had something to do with whatever made her feel unsafe, she answered, "Well, actually he had his brother and his nephew come to my job. Before he was caught for this particular robbery ... I was threatened." Wynn objected again and the trial court sustained the objection, noting that the witness could testify that people came to her job but "[t]hat's about as far as she can go with that." The witness then described running into Wynn's relatives in the parking lot at her job, where they followed her inside the building. She hid in the bathroom until they left, then immediately left work and never went back.

Several of the similar transaction officers referred to Wynn's outstanding warrants to explain why they had been watching the banks and why they chased

11

Wynn down the day he was arrested. One testified that they were looking for Wynn because "he had warrants for robbery," and another explained that he confirmed that he was chasing the right vehicle because he "knew that the . . . driver of that vehicle was going to be wanted out of Cobb County and Clayton County for robbery."

That Wynn was arrested because of another armed robbery was admissible as part of the similar transaction, and the Jeep owner's gratuitous reference to that arrest was simply cumulative. Further, the trial court sustained the objection to her testimony about the character of Wynn's entourage. The similar transaction officers' statements about why they were looking for Wynn "[were] not enough to unduly prejudice the jury." *Hensley v. State*, 300 Ga. App. 136, 137 (684 SE2d 673) (2009). "The existence of the underlying warrant[s] was the reason the police were chasing [Wynn] and without knowing that, the context of the incident would have been incomplete and confusing." Id.

The trial court's final charge to the jury instructed it that the indictment and plea formed the issue the jury was to decide, that Wynn was presumed innocent until proven guilty, that the State carried the burden of proving every material allegation in the indictment and every essential element of the crime charged beyond a reasonable doubt, and that the State had the burden to negate or disprove beyond a

12

reasonable doubt any defense raised by the evidence. It instructed the jury on the elements of the crimes of armed robbery with intent to commit theft and possession of a firearm during the commission of a crime, and on the essential element of intent. The trial court also gave a lengthy charge regarding the limited purpose for which evidence of other offenses could be considered by the jury, and reiterated that Wynn was on trial only for the particular offenses charged in the bill of indictment. Considering the trial court's instructions to the jury, including the curative instructions discussed in Division 2, the fact that evidence related to the events leading to Wynn's arrest was properly before the jury, and the overwhelming evidence of Wynn's guilt, we cannot agree that Wynn's right to due process was violated by the admission of bad character evidence.

4. Wynn contends that his trial counsel was ineffective for failing to object to several of the bad character references discussed above.

> [T]o establish ineffectiveness of trial counsel, appellant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. Failure to satisfy either prong of this test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong. There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of

13

the conduct is viewed at the time of trial and under the circumstances of the case. In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo.

(Citations and punctuation omitted.) *Brown v. State*, 321 Ga. App. 765, 766 (743 SE2d 452) (2013).

In his argument, while Wynn cites to the transcript at seven locations, he does not discuss what transpired there or explicate why counsel should have objected. The testimony at some of the cited pages is not bad character evidence. In another instance, previously addressed in Division 3, the State redirected the witness after she testified that Wynn was caught in another armed robbery case. The final two citations in Wynn's brief are to similar transaction testimony we also addressed in Division 3. Further, Wynn elicited no testimony in his motion for new trial hearing from his trial counsel regarding the thought process behind these alleged failures to object, asking only whether it was counsel's usual strategy not to object to any of a State's witness's testimony. Counsel responded,

Normally, you know, on every case and every witness that comes up I make a determination whether or not I believe what they had was either important or needed for me to cross examine them, and if I choose not

14

to cross-examine somebody ... [it] could be strategy to de-emphasize their testimony, act like they're not really important and hope the jury gets that same feeling.

"[A] tactical or strategic decision made by counsel cannot form a basis for ineffective assistance of counsel unless it was so patently unreasonable that no competent attorney would have chosen it." (Citation and punctuation omitted.) *McNair v. State*, 296 Ga. 181, 183 (2) (766 SE2d 45) (2014). Here, Wynn has not shown that his trial counsel's failure to object to the testimony discussed above was patently unreasonable and a decision that no competent attorney would have made. "Nor, given the evidence presented, can [Wynn] show [a reasonable probability] that the outcome of his trial would have been different had this . . . testimony been excluded." Id. at 184 (2) (b). Under the circumstances, Wynn has failed to show that his trial counsel was ineffective. Accordingly, we find no merit to this enumeration.

5. Finally, Wynn argues that the trial court erred in sentencing him to life without parole, arguing that the longest period of time prescribed for punishment of armed robbery is life imprisonment, and that life without parole is not a sentencing option. His argument lacks merit.

OCGA § 16-8-41 (b) provides that a person convicted of the offense of armed robbery shall be punished by imprisonment for life or for not less than 10 or more than 20 years. OCGA § 16-8-41 (d) provides that a person convicted of armed robbery is subject to the recidivist provisions of OCGA §§ 17-10-6.1 and 17-10-7. OCGA § 17-10-7 (a) provides that, upon a second felony conviction, a person shall be sentenced to the longest period of time prescribed for punishment of the second offense, although the sentencing court may probate or suspend the maximum sentence. Under OCGA § 17-10-7 (c), upon a fourth felony conviction, a person must serve the maximum time sentenced "and shall not be eligible for parole until the maximum sentence has been served."

The State served Wynn with notice of its intent to seek recidivist punishment, and at sentencing introduced evidence of Wynn's three prior felony convictions. The trial court thus properly sentenced him to life imprisonment without parole on his armed robbery conviction, and in fact had no discretion to do otherwise. *Lester v. State*, 309 Ga. App. 1, 4-5 (2) (710 SE2d 161) (2011).

*Judgment affirmed. Ray and McMillian, JJ., concur.*