303 Ga. 225
FINAL COPY

S17A1627. TAYLOR v. THE STATE.

MELTON, Presiding Justice.

Following a jury trial, Yvette Taylor appeals her conviction for the felony murder of Theodore Crew, contending that the trial court made a number of evidentiary errors, including the introduction of improper character evidence and an allegedly involuntary confession.[1] For the reasons set forth below, we affirm.

1. In the light most favorable to the verdict, the record shows that, at the time of the murder, Taylor served as a live-in caretaker for Crew, a disabled older man. On the evening of Crew's death, around 11:40 p.m., Taylor asked a

---

[1] On April 18, 2012, Taylor was indicted for malice murder and felony murder predicated on aggravated assault. Following a jury trial ending on February 8, 2013, Taylor was acquitted of malice murder, found guilty of felony murder, and sentenced to life imprisonment without the possibility of parole. On February 13, 2013, Taylor filed a motion for a new trial, which, after the entry of new counsel, was amended on February 26, 2015. The motion for new trial was denied by the trial court on March 12, 2015, and Taylor filed a timely notice of appeal. The resulting appeal was docketed to the August 2017 term of this Court and submitted for decision on the briefs.

neighbor, Tanya Griffin, for a ride to the store. While Griffin was getting ready, Taylor returned to her apartment to wait. When she returned to Griffin's apartment 15 minutes later, she was upset and complained for 10 to 15 minutes to Griffin about Crew, who had soiled himself. Taylor then changed her mind about going to the store. Around 12:15 a.m., Griffin saw Taylor go upstairs to her apartment. Thereafter, Taylor's neighbors began to hear noises including shouting, loud bumping like somebody hitting a wall, and sounds of a scuffle. One neighbor heard Crew say "Candace," which is Taylor's nickname, and heard Taylor repeatedly shout "motherf***er."

The next morning, Taylor called 911 and reported that she had found Crew dead. Crew's nude body was found on the bathroom floor; he had suffered 21 blunt force and 17 sharp force injuries on his head, neck, arms, chest, and hands. The medical examiner ruled Crew's death a homicide. Despite the signs of violent infliction of injury, there was less blood throughout the home than would be expected from Crew's injuries. Along with other factors, this indicated that the apartment had been bleached and cleaned.

In an initial statement, Taylor told an inspector that she went straight to her mother's apartment and did not return to her own apartment after visiting

2

Griffin. Later, at the police station, Taylor continued to maintain that she spent the night at her mother's apartment the night Crew was killed. She told police that Crew had been drinking beer that evening, a fact that may have explained why he was confused that "Candace" was in the apartment. The police terminated this questioning when Taylor asked for a lawyer.

Taylor's mother, Irene, originally stated that Taylor stayed with her the night of the murder. However, she later admitted that Taylor came to her apartment but then left at some point. The following morning, Taylor woke Irene up between 7:30 and 8:00, and told Irene not to scream and that Crew was dead. Irene then went to Taylor's apartment while Taylor called the police. Irene saw Taylor carrying a brown IGA bag and advised Taylor not to dispose of the bag in the dumpster near the apartment, as it would likely be searched. The police found a brown IGA bag in a wooded area near the apartment containing clothes, bloody paper towels, and a beer can of the same brand found in Taylor and Crew's refrigerator. They also found a box cutter a few feet from the bag.

After Taylor had been arrested and was being held in jail, Sergeant April March, a corrections officer at the jail, became worried that Taylor was not eating sufficiently. She told Taylor that, if she would eat, Sergeant March would

3

take her to the outdoor recreation area for a cigarette break. Taylor agreed, and during this cigarette break, the two started to talk about another inmate. Taylor then spontaneously admitted that she was tired of cleaning up after the victim and him watching her all the time. She added:

> I cut him, I admit that but I didn't kill him. I asked him if he wanted me to take him to the hospital because it kind of freaked me out. He said, no . . . so I left and asked some girl for a ride. Other people saw him fall and stuff. We were partying and I'm not a murderess.

Sergeant March reported this statement to investigators.

This evidence was sufficient to enable the jury to find Taylor guilty of the crime for which she was convicted beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Taylor contends that the trial court erred when it admitted her videotaped police interrogation into evidence over trial counsel's objection, contending that the contents of the videotape improperly contained opinions given by police officers regarding her guilt, veracity, and character. We disagree.

As an initial matter, we must consider the substance of Taylor's objection to this evidence at her Jackson-Denno hearing and at her subsequent trial. At the

4

<u>Jackson-Denno</u> hearing, Taylor objected to "the instances where officers were throwing out scenarios about how [Taylor murdered Crew]." She argued that these scenarios should be redacted and that it was improper to admit the police officers' "varied ideas of how [Taylor] might be guilty." Taylor, however, gave no underlying basis for her objection. At trial, Taylor renewed her objection as to the "issues . . . made at the <u>Jackson-Denno</u> hearing." She repeated that she found it objectionable to admit "scenarios thrown out by the police officers [as to] what might have happened." But, again, Taylor gave no specific grounds for this objection before the trial court denied it. For the first time, Taylor provided a reason for her objections in her motion for new trial, arguing that the police officers' statements improperly presented opinions regarding her guilt, veracity, and character. Taylor also argued that she had been unduly prejudiced as a ground for her objection for the first time on motion for new trial. Under the new Evidence Code, which applied to the trial of this case:

> (a) Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and: (1) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

5

OCGA § 24-1-103 (a) (1). Therefore, Taylor's arguments are subject only to a plain error analysis. See OCGA § 24-1-103 (d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.").

For plain error to exist,

[f]irst, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Punctuation omitted.) Gates v. State, 298 Ga. 324, 327 (3) (781 SE2d 772) (2016), quoting State v. Kelly, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

During interrogation, officers commented to Taylor that she had not been truthful with them, made various statements suggesting how and why Taylor killed Crew, and told Taylor that the interrogation would be played for a jury and that "ain't nobody in Columbia County gonna believe you didn't have

6

something to do with this." One officer stated, "I know you caused [Crew's] injuries." Taylor contends that these statements were inappropriate opinions of the police as to her guilt, veracity, and character and that the statements unduly prejudiced her defense.

Though Taylor fails to support her contentions with citations to our new Evidence Code, that Code is applicable to this case, as it was tried after January 1, 2013. Read broadly, Taylor's contentions could trigger consideration under OCGA § 24-7-704[2] and OCGA § 24-4-403.[3] Pretermitting whether the statements about which Taylor complains would have been inadmissible under

---

[2] OCGA § 24-7-704 provides:
(a) Except as provided in subsection (b) of this Code section, testimony in the form of an opinion or inference otherwise admissible shall not be objectionable because it embraces an ultimate issue to be decided by the trier of fact. (b) No expert witness testifying with respect to the mental state or condition of an accused in a criminal proceeding shall state an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

[3] This statute provides: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

7

either of these statutes, she fails to prove the third prong of the plain error test. As discussed in Division 5 below, Taylor ultimately confessed that she cut Crew on the night in question. Therefore, the statements made by police, which were interrogation ploys stating that she did exactly what she later confessed to doing, did not affect the outcome of her trial. There was no plain error. Gates, supra.

3. Taylor contends that the trial court improperly denied her request for a mistrial after her neighbor, Lorenzo Nealious, testified in a manner that allegedly placed her character into evidence. We disagree.

With regards to reporting the sounds of a fight in Crew and Taylor's apartment on the night of the murder, Nealious testified:

> I didn't know who to call. Didn't want to call the cops because I didn't want to be that neighbor that call [sic] the cops on anyone after what I heard from Ms. Taylor from the first day we moved in from — we don't call cops here. I couldn't understand that, not so much of you being a criminal or whatever because I didn't know her background at this point.

Trial counsel moved for a mistrial, and the trial court denied the motion.

It is within the sound discretion of the trial court to grant or deny a motion for mistrial, and such ruling will not be disturbed "unless it resulted from a manifest abuse of that discretion." Dulcio v. State, 292 Ga. 645, 648 (2) (740

SE2d 574) (2013); Robinson v. State, 298 Ga. 455 (3) (782 SE2d 657) (2016).

"When determining whether the trial court abused its discretion, we consider the statement itself, other evidence against the accused, and the actions of the trial court and counsel dealing with the impropriety." Wynn v. State, 332 Ga. App. 429, 434 (2)  (773 SE2d 393) (2015). Here, Nealious did not definitively state that Taylor had a criminal background, but rather that he did not know her background. So, as the trial court reasoned, Nealious testified as to a lack of knowledge of Taylor's character. Furthermore, even if the witness's testimony gives rise to the inference that the appellant had a criminal history, there is no error in denying a mistrial based upon an incidental reference to a defendant's character. See Allen v. State, 296 Ga. 785 (770 SE2d 824) (2015). Any reference to Taylor's criminal history was incidental to Nealious's explanation of his actions the night of the murder.[4]

Because Nealious's statement did not improperly place Taylor's character in evidence, the trial court did not abuse its discretion in denying the motion for

---

[4] Taylor complains that the court offered no curative actions. However, curative instructions are both unnecessary, when the trial court does not agree that character has been placed in issue, and not required, when they are not requested by trial counsel. Scott v. State, 290 Ga. 883 (725 SE2d 305) (2012).

mistrial.

4. Taylor contends that the trial court violated her Sixth Amendment right to confrontation when it allowed the medical examiner to testify, over trial counsel's objection, about the results of a toxicology screen conducted by another individual. At trial, Dr. Brown, the medical examiner, was asked whether toxicological testing was done on Crew's blood or urine and what the results of that testing were. Dr. Brown, who drew the blood and ordered the testing, answered that the blood test was negative for drugs and alcohol. Dr. Brown relied on the blood test to inform his opinion that Crew died of his injuries and not other causes.

In the context of scientific lab reports, the United States Supreme Court has held that the Sixth Amendment right to confrontation grants the accused a right "to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." Bullcoming v. New Mexico, 564 U. S. 647, 652 (131 SCt 2705, 180 LE2d 610) (2011). This Court has since held that someone with a significant personal connection to the test could testify in lieu of the scientist who actually conducted it. See Disharoon v. State, 291 Ga. 45

(727 SE2d 465) (2012); Leger v. State, 291 Ga. 584 (5) (732 SE2d 53) (2012).

In applying these standards, there is a critical distinction between cases where the lab results were admitted into evidence and those where the lab results were merely used in an expert's opinion. See Naji v. State, 300 Ga. 659 (2) (797 SE2d 916) (2017). Where the results of a laboratory test are not being admitted into evidence, but are instead being used to form part of the basis for an expert's opinion, it is not necessarily an abuse of discretion to allow an expert to testify about the lab results. See id. Here, the State did not seek to admit the toxicology report into evidence. Instead, Dr. Brown, who was tendered as an expert, used it to inform his opinion that the victim died of his injuries.

As Dr. Brown relied on the blood test to inform his opinion that Crew died of his injuries and not other causes, and the results of the blood test were not admitted into evidence, it was not an abuse of discretion for the judge to allow Dr. Brown to testify about the results.

5. Taylor contends that the trial court erred when it allowed Sergeant March to testify about statements Taylor made to her at the jail because Taylor had previously invoked her right to counsel. We disagree.

During interrogation, Taylor requested a lawyer, and the police stopped

11

questioning at that time. Two days later, on February 13, after Taylor attended her first court date, Sergeant March, a corrections officer, told Taylor that, if she would agree to eat something, Sergeant March would give her a cigarette. While out in the yard, Taylor spontaneously told Sergeant March that other people had seen "him" fall and that she had cut "him," but did not kill "him." Sergeant March responded with "you just have to make it right with the Lord."

When a defendant requests a lawyer, police must immediately cease interrogation, or its functional equivalent, including any words or actions by law enforcement calculated to elicit an incriminating response, until counsel is present. Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966); Walton v. State, 267 Ga. 713 (482 SE2d 330) (1997), citing Rhode Island v. Innis, 446 U. S. 291 (100 SCt 1682, 64 LE2d 297) (1980). In determining whether the actions of law enforcement constitute an interrogation, courts look primarily to "the perceptions of the suspect and not the intent of the officer." Franks v. State, 268 Ga. 238, 240 (486 SE2d 594) (1997). After counsel has been called for, custodial interrogation may not be reinitiated, unless either the suspect's counsel is present or the suspect reinitiates discussion on her own and freely and voluntarily waives her right to counsel. Edwards v. Arizona, 451 U.

12

S. 477 (II) (101 SCt 1880, 68 LE2d 378) (1981); Oregon v. Bradshaw, 462 U.
S. 1039 (103 SCt 2830, 77 LE2d 405) (1983); McDougal v. State, 277 Ga. 493
(1) (B) (591 SE2d 788) (2004).

Taylor claims that Sergeant March's actions, under the totality of the
circumstances, are the functional equivalent of interrogation. However, Sergeant
March's actions were not calculated to elicit an incriminating response. She took
Taylor out as an incentive to get her to eat. She did not ask, encourage, or
engage Taylor to talk about Crew's death. She followed her duty not to question,
but had no duty not to listen. State v. Brown, 287 Ga. 473 (2) (697 SE2d 192)
(2010). When a suspect admits to her guilt without being prompted, that
admission is not suppressed merely because she earlier invoked the right to
counsel. Id.

Judgment affirmed. All the Justices concur.

Decided March 5, 2018.

Murder. Columbia Superior Court. Before Judge Brown.

Christina R. Cribbs, Russell R. Jones, Jacob D. Rhein, for appellant.

Natalie S. Paine, District Attorney, Joshua B. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.