**FIFTH DIVISION
MCFADDEN, P. J.,
GOBEIL and LAND, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 20, 2022**

# In the Court of Appeals of Georgia

A22A0787. MOSS v. THE STATE.

GOBEIL, Judge.

A Cobb County jury found Ricky Remon Moss guilty of rape, aggravated sexual battery, and false imprisonment based on an incident that took place in 1998. Moss appeals from his judgment of conviction and the denial of his motion for new trial, asserting that the trial court erred in: (1) overruling his objection to the State's use of its peremptory strikes to affect the racial makeup of his jury under *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986); (2) allowing a witness to give improper "surrogate" testimony about the results of DNA analysis when the witness did not have a "substantial personal connection" to the DNA testing at issue; (3) overruling his hearsay and Confrontation Clause objections to witness testimony that Moss's DNA was a match to DNA collected in the victim's rape kit; and (4)

overruling his objection to OCGA § 24-4-413 prior sexual offense evidence when the State failed to prove that Moss was the perpetrator of the prior offense. For the reasons set forth below, we affirm the trial court's denial of Moss's motion for new trial.

"On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and the defendant no longer enjoys a presumption of innocence." *Williams v. State*, 333 Ga. App. 879, 879 (777 SE2d 711) (2015) (citation and punctuation omitted).

So viewed, the record shows that the victim, D. B., was 16 years old in December 1998. She and a friend met a man at a Blockbuster video store. D. B. gave this man her phone number, and he called her a couple of times in the following weeks. On December 17, 1998, the man called D. B. and asked her to join him for lunch. The man picked D. B. up from her home, and the two went to a restaurant.

The man drove D. B. back to her house, and D. B. wanted to go inside. The man "said something about coming inside" and when D. B. said no, he said "can I at least get a hug." As D. B. went to give him a hug, the man slid his hands down her pants and grabbed her bottom. She pushed away and told him to stop, but he moved his hand to the front of her pants and inserted his fingers in her vagina.

D. B. fought against the man, and escaped the man's car. She opened the garage door with a remote and headed towards the garage. The man came up behind her, put his arms around her, and walked her into the garage. He held her hands behind her back and bent her over the front of her vehicle that was parked in the garage. The man pulled her pants down and raped her while she pleaded with him to stop. Afterwards, he pulled her pants back up and told her he would call her and then left.

Shortly after the assault, D. B.'s sister arrived home. D. B. told her sister what happened, and the two went to the police station and then to the hospital. A doctor conducted a pelvic exam on D. B. and collected evidence for a rape kit. The kit was turned over to Detective Daniel Rossman with the Cobb County Police Department. Rossman also spoke to the victim in her exam room, collected her clothing for evidence, and arranged to interview her the next day.

D. B. gave a description of her attacker: she told the investigators that she thought his name was "Enricky" or "Anricko," he was 6' 4" with a medium build and dark hair and eyes. She described his hair and facial hair, what he was wearing on the day of the attack, and the car he drove. She believed he was part black or part

3

Hispanic or mixed race. When he called her phone, the caller ID indicated that he was calling from Smyrna.

Detective Rossman followed some leads in an attempt to identify the perpetrator, but was unable to develop a suspect. Three or four months after the incident, Rossman placed the case in inactive status. The rape kit was not submitted to the Georgia Bureau of Investigation ("GBI") for testing because the GBI's policy at the time was to not test rape kits without a known suspect.

Almost 20 years later, in October 2017, the rape kit collected from D. B. was analyzed by an independent forensic lab located in Salt Lake City, Utah that had contracted with the GBI, Sorenson Forensics ("Sorenson"). Two items from the kit were analyzed, vaginal swabs and gauze. Male DNA was identified in both items, and a male DNA profile was detected and returned to the GBI.

The DNA profile was reviewed by a GBI scientist and forwarded to a database administrator to be entered into the GBI database and searched against other profiles in a national database. A match came back in February 2018, identifying Moss as a match for the DNA from the rape kit. Additional buccal swabs were taken from Moss, which also matched the DNA from the rape kit. The case was reactivated, and Detective Clint Monahan of the Cobb County Police Department obtained an arrest

4

warrant for Moss. Moss was indicted for rape, aggravated sexual battery, and false imprisonment.

A jury found Moss guilty on all charges, and the trial court sentenced him to two consecutive life sentences plus ten years. He filed a motion for new trial, as amended, which the trial court denied after a hearing. This appeal followed.

1. Moss first raises a *Batson* challenge, arguing that the State used its peremptory jury strikes in a racially discriminatory manner. Moss raised this issue during the trial, lodging a *Batson* objection immediately after the jury was selected. The trial court found that Moss made a prima facie showing of discrimination based on the State's use of strikes against non-white persons. The trial court allowed the State to put forward its race-neutral explanations for striking the jurors, and allowed Moss to argue discriminatory intent. The trial court placed one of the struck jurors onto the jury, but otherwise overruled Moss's objection. After Moss raised this issue in his motion for new trial, the trial court found that considering the totality of the circumstances, Moss failed to prove discriminatory purpose in the State's use of peremptory strikes.

A *Batson* challenge involves three steps: (1) the opponent of a peremptory challenge must make a prima facie showing of racial

5

discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven the proponent's discriminatory intent.

*Thomas v. State*, 309 Ga. 488, 490 (2) (847 SE2d 147) (2020) (citation and punctuation omitted). "(A) trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous." Id. at 491 (2) (citation and punctuation omitted); see also *Snyder v. Louisiana*, 552 U. S. 472, 477 (II) (128 SCt 1203, 170 LE2d 175) (2008) ("The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge[.]") (citations and punctuation omitted).

Here, the record shows that the pool of prospective jurors was made up of six black persons, twenty-four white persons, three Hispanic persons, one Asian person, and two persons whose race was not noted. The State used its peremptory strikes to strike three black jurors, three Hispanic jurors, and one Asian juror. The State used one alternate strike on a white juror. Ultimately, fourteen jurors were selected for the jury, with thirteen white jurors and one black juror selected.

6

Based on this record, the trial court found that Moss made a prima facie case of racial discrimination in the State's use of peremptory strikes. Moving on to step two, the State provided its reasons for striking each juror. On appeal, Moss challenges four of these strikes, so we will focus on those jurors: Jurors 13, 16, 22, and 33.

For Juror 13, a Hispanic male, the State stated that it struck him because he had a criminal history and because he had a potential hardship in that he shared a vehicle with his girlfriend and may not have reliable transportation. For Juror 16, an Asian male, the State stated that it struck him because he indicated that serving as a juror would be a hardship for him based on his family and work commitments, specifically mentioning that he has a sick wife who needed his attention. For Juror 22, a Hispanic male, the State stated that he had very little to say during voir dire and mentioned a hardship to the attorneys in private that he lived alone and would have difficulty paying his bills if he served on the jury. For Juror 33, a black male, the State stated that it "didn't get a read from him." The trial court stated: "Because he didn't answer a single question." The State responded that the decision was made towards the end of jury selection, after the defense was out of strikes. So the prosecutor would get to choose who would be placed on the jury and knowing that she "had gotten a better

read on the next few people," she struck Juror 33. There was also Juror 31, a black female, who the State claimed to have struck because she was a teacher.

After Moss made his argument, focusing on similarly situated white jurors that were not struck by the State, the trial court found that Juror 31 should be placed on the jury because the State did not put forward a race-neutral reason to strike her. The court found that the reasons for striking the other jurors were race neutral. Moss asked for a continuing objection to the challenged jurors.

On appeal, Moss concedes that the State provided "facially race-neutral" reasons for striking all of these prospective jurors. He argues, however, that the State's use of all of its peremptory strikes on non-white persons creates a strong prima facie case and gives rise to an inference of discrimination. See *Ford v. State*, 262 Ga. 558, 559-561 (2)-(4) (423 SE2d 245) (1992) (where the State used nine of ten peremptory strikes on black prospective jurors, there was a strong prima facie case of racial discrimination, and the State was required to carry a heavy burden to overcome it). And, according to Moss, the reasons put forth by the State to strike these jurors could have applied equally to white prospective jurors that the State did not strike, thereby providing evidence that the State's race-neutral reasons were pretextual.

8

Given the deference we are required to give to the trial court in this situation, we conclude that the trial court's acceptance of the State's facially race-neutral reasons for striking non-white jurors was not clearly erroneous. As demonstrated by the record and described in the State's brief, although some of the seated jurors had similar circumstances to some of the struck non-white jurors, there were also differences in the jurors' situations that could justify striking one but not the other.

For example, Moss argues that white Jurors 7, 8, and 36 also expressed hardships yet were not struck by the State like non-white Jurors 13, 16, and 22. For the jurors not struck by the State, the record shows the following: Juror 7 had a previously-booked business trip that would conflict with the trial. However, when questioned about his hardship, the juror stated that he could cancel the tickets and did not believe it would be a problem to serve on the jury. Juror 8 suffered a back injury and required pain killers, but stated that he is still able to function and would merely require getting up after long periods of sitting. Juror 36 was a single mother who had a child that she had to pick up from daycare, but she stated that she could pick her up as late as 6:30 p.m.

These hardships contrast with those by the jurors who were struck from the pool. For example, Juror 16 described his hardship as "threefold" because it would

9

be very difficult for him to arrange care for his sick wife for a full week, he had a child to drop off at school and he did not believe he could make the required arrival time for court, and he had a heavier than normal workload due to the resignation of a coworker. Juror 22 asked to speak about his hardship privately, and stated that it "was a necessity thing" because he needed his work income to pay his bills. Juror 13 had a travel hardship combined with a criminal history, so the State had more than one reason to justify its strike in his situation.[1] Thus, although similarly situated in some ways, other facts support the trial court's finding that the State's proffered reasons for striking the non-white jurors were not based on their race, but rather on the severity of their expressed hardships and their willingness to serve on the jury. See *Demery v. State*, 287 Ga. 805, 808-809 (2) (700 SE2d 373) (2010) (affirming trial court's denial of *Batson* challenge in case involving expert testimony on "battered person syndrome" where the State struck a black juror who was in graduate school to be a counselor, but did not strike other non-black jurors who had general education in or had engaged the services of a counselor; Supreme Court found the jurors were

[1] Moss argues that Juror 36 also had a potential travel hardship and a criminal history, yet was not struck by the State like Juror 13. However, the State explained that it was not concerned with Juror 36's criminal history because her conviction was based on conduct by her ex-husband, whereas Juror 13 did not explain the circumstances of his conviction.

not so similarly situated so as to warrant the reversal of the trial court's findings); *Taylor v. State*, 303 Ga. 624, 634-635 (3) (814 SE2d 353) (2018) (holding that the trial court did not clearly err in finding that the defendant did not prove discriminatory intent where the State provided credible race-neutral reasons for striking black jurors; Supreme Court found that similarities between the struck black jurors and the not struck white jurors were not so exact so as to warrant reversal of the trial court's findings as to discriminatory intent).

Moving beyond the hardship jurors, Juror 33 was struck because the prosecutor could not get a good "read" on him because he did not answer many questions during voir dire. Moss points to Juror 21, a white female, who likewise failed to respond to many specific voir dire questions, and only answered questions concerning her family and career. Further, the State argues that the jurors' placement in the order of the venire distinguishes the strategy the State was employing during jury selection. By the time Juror 33 was struck, the defense was out of strikes and the prosecutor was able to choose who she wanted on the jury, so she struck Juror 33 to get to other jurors about whom she had learned more. These are exactly the kind of juror and attorney "demeanor" questions that are squarely within the province of the trial judge. *Snyder*, 552 U. S. at 477 (II).

11

Given that the State's race-neutral reasons for striking the non-white jurors are supported by the record, and given our deference to the trial court's observations of the prospective jurors and the attorneys in these contests, we conclude that the trial court's denial of Moss's *Batson* challenge was not clearly erroneous. See *Toomer*, 292 Ga. at 57-58 (2) (d) (even where the prosecutor's explanations for striking jurors "may not be compelling" to an appellate court, the trial court's ultimate finding is entitled to great deference). Accordingly, we affirm the trial court's denial of Moss's motion for new trial on this issue.

2. Moss next argues that the trial court erred in overruling his objection to Derek Cutler's testimony about the results of the DNA testing performed at the Sorenson lab. Specifically, he raises a claim under *Bullcoming v. New Mexico*, 564 U. S. 647 (131 SCt 2705, 180 LE2d 610) (2011), that Cutler's testimony was "surrogate testimony" in violation of his Sixth Amendment right to confront the witness who performed the test.

At trial, Cutler identified himself to the jury as a former forensic DNA analyst and supervisor employed at Sorenson from 2012 to 2019. Cutler testified about his qualifications and the general testing procedures at Sorenson. He also testified specifically to the procedure used on State's Exhibit 1, the evidence collected from

12

D. B.'s rape kit and sent to Sorenson by the GBI. Several individuals who did not testify at trial were identified as the people who conducted the actual steps to extract, purify, quantify, and amplify the DNA before an analyst interpreted the data. The testing procedures detected male DNA present in both items that were tested. A reporting analyst, Eric Seat, interpreted the data and identified a major male DNA profile present. Cutler was Seat's direct supervisor, and operated as the second analyst of the data, who "peer reviewed" Seat's data interpretation.[2] Following Cutler's peer review, the evidence and the report with the DNA profile were sent back to the GBI.

At the outset, we agree with the State that Moss's Sixth Amendment objection to Cutler's testimony about the presence of a major male DNA profile was not properly preserved. Accordingly, we review it for plain error only. Although Moss made a *Bullcoming* objection after his voir dire of the witness, the trial court made no ruling on the substance of the objection, stating that it was premature because Cutler

---

[2] Cutler described that during the peer review process, "a second qualified analyst will interpret the data and come up with their conclusions and make sure that they agree with the previous analysts's conclusions."

13

had testified only to his qualifications at that point. When Cutler actually testified about Seat's report, Moss made no objection.[3]

"To establish plain error, [Moss] must show (1) an error that was not affirmatively waived, (2) that the error was clear and obvious, and (3) that the error affected his substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings." *Moore v. State*, 306 Ga. 500, 503 (3) (831 SE2d 736) (2019) (citation and punctuation omitted). If the first three prongs are satisfied, we have the discretion to remedy the error if it seriously affects the fairness, integrity, or public reputation of the proceedings below. *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

Under *Bullcoming*, when confronted with the results of a laboratory test used as evidence against the accused, the accused's Sixth Amendment right to confrontation includes the right "to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." 564 U. S. at 652. The Georgia Supreme Court has since clarified that "someone with a significant personal

---

[3] Additionally, during another witness's testimony, Moss's counsel acknowledged that she had not renewed the *Bullcoming* objection to Cutler's testimony because the State did not seek to introduce the actual report at that time.

14

connection to the test could testify in lieu of the scientist who actually conducted it." *Taylor v. State*, 303 Ga. 225, 230 (4) (811 SE2d 286) (2018) (citation and punctuation omitted).

Under the circumstances here, Cutler was the analyst directly supervising the primary analyst interpreting the DNA data in Moss's case, and he peer-reviewed the data personally before it left his lab. Accordingly, it was not plain error for the trial court to allow him to testify that a major male DNA profile was identified after testing and the results were sent to the GBI for further review. See *Disharoon v. State*, 291 Ga. 45, 48 (727 SE2d 465) (2012) (signaling that the holding in *Bullcoming* was not "so broad as to make it applicable to a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue") (citation and punctuation omitted). We therefore find no reversible error on this claim.

3. Related to his claim in Division 2, Moss challenges the testimony from two GBI witnesses that the DNA extracted from the rape kit matched DNA taken from Moss.

The first GBI witness whose testimony Moss challenges is Jose Mundo, a forensic scientist. Mundo testified that the GBI received the DNA profile in this case

15

from Sorenson and entered it into its database to be compared to all other DNA profiles in the database. When the GBI got a match, Mundo re-analyzed the data to ensure that it actually matched the DNA profile recovered from the rape kit. As another assurance of accuracy, Mundo requested law enforcement to take another DNA sample from the matching individual, Moss, to compare once again to the DNA from the rape kit. The second witness, Kimberly Turpin, was the forensic biologist who compared the DNA sample taken from Moss to the DNA profile extracted from the rape kit by Sorenson. She testified that the DNA taken from Moss matched the DNA profile from the rape kit.

On appeal, Moss asserts that because the report and underlying data from Sorenson were never entered into evidence, these witnesses' testimony, based on these reports, constituted inadmissible hearsay and violated his Sixth Amendment right to confront witnesses.

First, as to hearsay, where an expert witness bases their opinion on facts "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data need not be admissible in evidence in

order for the opinion or inference to be admitted." OCGA § 24-7-703.[4] Thus, even though the lab report and data themselves were not in evidence, there was no hearsay violation in allowing the GBI scientists to testify to their opinion that the DNA from the rape kit was a match to Moss.

Second, as to the Confrontation Clause, Moss cites only *Williams v. Illinois*, 567 U. S. 50, 57-58 (132 SCt 2221, 183 LEd2d 89) (2012), in which a plurality of the Supreme Court held that the admission of expert testimony relying on the results of a DNA test that was not admitted into evidence did not violate the Confrontation Clause. Moss argues that *Williams* is distinguishable from his case because the evidence in *Williams* was admitted at a bench trial, and the Court was confident that the trial judge understood the limited reason for mentioning the DNA test results and would not consider it for any improper purpose. 567 U. S. at 72-73 (III) (B).

*Williams* presents a similar factual scenario to Moss's case. In *Williams*, the Illinois State Police ("ISP") sent biological samples from a rape kit to a private laboratory for testing. 567 U. S. at 59 (I) (A). The private lab sent back a report containing a male DNA profile extracted from the samples in the rape kit. Id. A

---

[4] Although the offenses occurred in 1998, because Moss's trial took place in 2019, Georgia's new evidence code was in effect. See Ga. L. 2011, p. 99, § 101 (Act enacting evidence code applies to any trial commencing on or after January 1, 2013).

17

scientist with the ISP conducted a computer search, and there was a match between the DNA report from the private lab and the defendant. Id. At the defendant's bench trial, no one from the private lab testified, and the report from the private lab was not admitted into evidence. See id. at 60-62 (I) (B). Rather, the ISP scientist testified that the computer showed a match between the DNA profile identified by the private lab and samples taken from the defendant. Id. As described above, a plurality of the Supreme Court held that the defendant's right to confront witness was not violated because the ISP witness was not testifying to the truth of the report from the private lab; rather, she was assuming the truth of the private lab's report and testifying to her expert opinion that the DNA profile she was given matched the defendant. Id. at 57-58, 70-72 (III) (A), (B). Additionally, as explained above, the Court highlighted that this was a bench trial, and there was no concern about jury confusion as to what facts could be considered for what proper purpose. Id. at 72-73 (III) (B).

Although a similar factual scenario, an important distinction exists between the bench trial in *Williams* and Moss's jury trial. In Moss's trial, a witness from Sorenson testified about the DNA profile that was extracted from D. B.'s rape kit. As described above, Culter, a supervisor who peer-reviewed the report in Moss's case, testified about Sorenson's methods and how it came to the results that were eventually

matched to Moss. Although Moss did not cross-examine Cutler, he had the opportunity to do so. Therefore, because a witness with personal knowledge of the report and data testified and was subject to cross-examination, the Confrontation Clause problem identified in *Williams* is not present in the instant case. Indeed, the Georgia Supreme Court has considered this issue and found no Confrontation Clause violation.

> In applying [the Sixth Amendment right to confront witnesses], there is a critical distinction between cases where the lab results were admitted into evidence and those where the lab results were merely used in an expert's opinion. Where the results of a laboratory test are not being admitted into evidence, but are instead being used to form part of the basis for an expert's opinion, it is not necessarily an abuse of discretion to allow an expert to testify about the lab results

*Taylor*, 303 Ga. at 230 (4) (citing *Naji v. State*, 300 Ga. 659, 662-663 (2) (797 SE2d 916) (2017) (no Confrontation Clause violation where medical examiner used another person's autopsy report, which was not admissible, to testify about his opinion of victim's cause of death)). Accordingly, we affirm the trial court's denial of Moss's motion for new trial on these grounds.

4. Finally, Moss challenges the introduction of prior sexual offense evidence that was admited pursuant to OCGA § 24-4-413. Specifically, he challenges the

testimony of A. D., who testified that she was sexually assaulted when she was 14 years old by a teacher at her school named "Anricky" in 1997. Moss asserts that the State failed to prove that he was the perpetrator of the crimes against A. D.

As relevant here, the State filed a pretrial notice of its intent to introduce evidence of a prior sexual offense pursuant to OCGA § 24-4-413. At a pretrial hearing on the other acts evidence, the trial court ruled the 1997 incident and other incidents would be admissible at trial.[5] Before the witnesses concerning these offenses testified, the trial court gave a limiting instruction stating that, before the jury could "consider any other alleged acts, [the jury] must first determine whether it is more likely than not the accused committed the other alleged acts and such act was, in fact, an act of child molestation, statutory rape, or sexual battery."

A. D. then gave her testimony about the incident from 1997. She was 14 years old at the time, and living in Texas. She was asked if she had the occasion "to meet a Ricky Moss," and she responded: "Yes, I did." She stated that she knew him by the name of Anricky. She described that she met him at her school where he was employed as a teacher, and he eventually coerced her into having sex with him

---

[5] Moss is not challenging the introduction of these other incidents, for which he was convicted of misdemeanors.

repeatedly. She identified the man to police, but asked that the case against him be dropped because she did not want to ruin his life. Moss raised an objection the next day to A. D.'s testimony, which was overruled.

Pursuant to OCGA § 24-4-413 (a), in a sexual offense trial, "evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant." This is "a rule of inclusion, with a strong presumption in favor of admissibility, and the State can seek to admit evidence under [this] provision[] for any relevant purpose, including propensity." *King v. State*, 346 Ga. App. 362, 364 (1) (816 SE2d 390) (2018) (citation, punctuation, and footnote omitted). A trial court's decision to admit this kind of evidence "will be overturned only when there is a clear abuse of discretion." Id. (citation and punctuation omitted).

We do not find an abuse of discretion in the trial court's admission of A. D.'s testimony about Moss's prior sexual assault. "[A] trial court's decision to admit other acts evidence will be affirmed if a jury could find by a preponderance of the evidence that the defendant committed the act." *Bully v. State*, 357 Ga. App. 663, 670 (4) (849 SE2d 271) (2020) (citation and punctuation omitted). The jury was correctly instructed on the State's burden in this regard. Although not overwhelming, the State

21

provided evidence that it was Moss who assaulted A. D., because when asked if she had an occasion to meet Ricky Moss, she responded affirmatively. She then explained that she knew him as Anricky, and went on to describe how she met this man and what he did to her. The witnesses's testimony was therefore sufficient to establish Moss's identity by a preponderance of the evidence. See OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact."). We find no error in the court's admission of this evidence.

For all of these reasons, we affirm the trial court's denial of Moss's motion for new trial.

*Judgment affirmed. McFadden, P. J., and Land, J., concur*.