### S13A0026. DURDEN v. THE STATE.
(744 SE2d 9)

NAHMIAS, Justice.

Shinderen Durden appeals from his convictions for malice murder and other crimes relating to the shooting death of Shannon King. We affirm the convictions and sentences except for Appellant's sentence for aggravated assault, which we vacate, and his felony sentence for tampering with evidence, which we vacate and remand for resentencing as a misdemeanor.[1]

1. (a) Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following. In November 2008, Appellant and King were living in an unfurnished house that Appellant had been hired to renovate. Although they had been together for only eight months, there had been several instances of domestic violence, including an incident in August 2008 during which Appellant put a gun to King's stomach and told her that he was going to kill her.

---

[1] The crimes occurred on November 9, 2008. On February 9, 2009, Appellant was indicted by a DeKalb County grand jury for malice murder, felony murder, aggravated assault with a deadly weapon (a handgun), battery, tampering with evidence, and two counts of cruelty to children in the third degree. Appellant was tried before a jury. At the close of the State's case, the trial court directed a verdict of not guilty on the battery charge; the jury found Appellant guilty of the other charges on November 12, 2009. On November 24, 2009, the trial court sentenced Appellant to life in prison for malice murder; 20 concurrent years for aggravated assault; 10 consecutive years for tampering with evidence; and 12 concurrent months on both child cruelty counts. The felony murder conviction was vacated by operation of law. Appellant filed a timely motion for new trial, which he amended on August 4, 2011, and February 6, 2012. The trial court denied the motion on February 22, 2012. After Appellant filed a timely notice of appeal, the case was docketed to the January 2013 term of this Court and submitted for decision on the briefs.

On the morning of November 9, 2008, Appellant and King were at the house with her three young children from another relationship, who were visiting: eight-year-old Alexis, six-year-old Malik, and five-year-old Khalif. Appellant and King began arguing about financial problems, and Appellant told the children to go to the garage. Khalif stayed in the garage, but Alexis and Malik came back inside, where they saw their mother get a knife out of a kitchen cabinet and stab the counter. Appellant then hit King, who dropped the knife. Malik picked up the knife to give to his mother to defend herself, but when he did so, Appellant pointed a gun at the child, threatened him, and took the phone from him so that he could not call the police. Terrified, Malik and Alexis ran into a closet in one of the bedrooms. From there, Alexis peeked out and saw Appellant on top of King, punching her. Moments after Alexis went back into the closet, she heard a gunshot. She and Malik ran into the living room, where they saw their mother lying on the living room floor with blood coming out of her ears and head. Appellant told the children that their mother had shot herself. Instead of calling 911, Appellant had the children help him put King into his car, and they all drove to a nearby hospital. On the way, Appellant threw a gun out the window.

Appellant told hospital personnel, as well as police officers who were called to the hospital, that King had shot herself after their argument had ended, while he was renovating the cabinets in a bathroom in the back of the house. Appellant also volunteered that he had thrown the gun into the woods on the way to the hospital, claiming that he was afraid King would get into trouble. He took the police to that location, where they found a .380-caliber pistol. Appellant was then interviewed at police headquarters, where he initially told the same story that he had told the officers at the hospital. He added, however, that after he and King argued, she had gone out to a car to get her .380 gun and returned to the living room, after which Appellant heard a shot and ran into the living room to find her on the floor with the gun by her side. After Appellant added even more details that he had not mentioned before, he was arrested. Alexis testified at trial that while she was at the house that morning, she never saw her mother with the gun and never saw Appellant go into the bathroom to work on the cabinets there.

Shannon King died from a gunshot wound to the left side of her head. The medical examiner opined that her death was a homicide. He testified that he did not think it was possible to self-inflict the type of wound that King sustained, because she appeared to have been shot by a gun that was more than two feet away from her head. He explained that nearly all self-inflicted gunshot wounds are contact

wounds, characterized by large size, lacerations, evidence of burning, and the presence of gunpowder inside the wound, but no such evidence was found here. Furthermore, most self-inflicted gunshot wounds are inflicted with the shooter's dominant hand; King was right-handed, but the wound was on the left side of her head.

The bullet recovered from King's head was fired from the .380-caliber pistol found in the woods. There were no latent fingerprints on the gun, but a gunshot residue test performed on Appellant's hands revealed eight particles that were characteristic of gunshot primer residue.

(b) Appellant contends that the evidence was insufficient to support his convictions. However, viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of all the crimes of which he was convicted and sentenced. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009). (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)). Contrary to Appellant's argument, even though no witness directly identified him in the courtroom as the person who committed the crimes, there was sufficient evidence to authorize the jury to find that he was the perpetrator. Appellant was called by the name Shinderen Durden in the courtroom, and witnesses for both the State and the defense, including Alexis, hospital personnel, and police officers, repeatedly testified that they knew or spoke with "the defendant, Shinderen Durden." "Concordance of name alone is some evidence of identity. Identity of name presumptively imports identity of person, in the absence of any evidence to the contrary." *Roebuck v. State*, 277 Ga. 200, 201 (586 SE2d 651) (2003) (citations and punctuation omitted). In addition, a photograph taken of "the defendant" when he was arrested was admitted into evidence at trial and thus available for the jury to compare to Appellant. This was sufficient evidence of Appellant's identity as the perpetrator of the crimes, particularly in the absence during trial of any claim of misidentification.

(c) There was ample evidence to support Appellant's convictions for both malice murder and aggravated assault with a deadly weapon, which was committed against a person living in the same household, see OCGA § 16-5-21 (j). The trial court sentenced Appellant separately on those two convictions, consistent with *Hall v. State*, 287 Ga. 755 (699 SE2d 321) (2010), where we held in a footnote that a

defendant could be sentenced separately for these two offenses, saying:

> [The defendant] was sentenced . . . to life in prison for the malice murder conviction and a concurrent 20-year sentence for the family violence aggravated assault conviction. See OCGA § 16-5-21 (j) (family connection as essential element State must prove for conviction); see generally *Eidson v. State*, 262 Ga. App. 664 (1) (586 SE2d 362) (2003). See also *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006) (where single act by defendant is element in two offenses, offenses do not merge where each offense requires proof of an additional fact).

*Hall*, 287 Ga. at 755, n. 1. Having considered this point further, however, we have concluded that *Hall* was incorrect; close examination of the aggravated assault statute, OCGA § 16-5-21, makes it clear that the fact that an aggravated assault is committed against a person living in the same household is not an *element* of the offense but merely a *sentencing factor*.

The elements of the various forms of aggravated assault are specified in subsection (a) (1)-(3) of OCGA § 16-5-21, which begins with the phrase, "A person *commits the offense* of aggravated assault when he or she assaults . . . ." (Emphasis added.) Subsection (b) then says:

> Except as provided in subsections (c) through (k) of this Code section, a person *convicted* of the offense of aggravated assault shall be *punished* by imprisonment for not less than one nor more than 20 years.

(Emphasis added.) If "the offense of aggravated assault" involves particular exacerbating factors, subsections (c) through (j) provide mandatory minimum sentences of either three or five years in prison, instead of the default minimum of one year under subsection (b), although the sentence remains capped at the same 20 years.[2] For

---

[2] Subsection (k) is somewhat different. While it also deals with an exacerbating factor — aggravated assault "with intent to rape against a child under the age of 14 years" — it provides for a mandatory minimum sentence of 25 years and a maximum sentence to 50 years in prison. Because a finding that the offense was committed against a child under age 14 increases the maximum sentence, the Constitution requires that this fact be treated as an element of the crime. See footnote 3 below. We do not address subsection (k) further in this opinion.

We also note that OCGA § 16-5-21 was amended in 2010 to add subsection (l), which provides a five-year mandatory minimum sentence for aggravated assault "upon an officer of

example, the minimum sentence is five years if the offense is committed against "a peace officer while the peace officer is engaged in, or on account of the performance of, his or her official duties," OCGA § 16-5-21 (c); three years if the victim is "65 years of age or older," OCGA § 16-5-21 (d); and three years if, as in this case, the victim is a spouse, child, parent, or any other person (except a sibling) "living or formerly living in the same household," OCGA § 16-5-21 (j).

Thus, the language and structure of OCGA § 16-5-21 demonstrate that the facts which the State must prove beyond a reasonable doubt to convict a defendant of the offense of aggravated assault — the essential elements of that crime — are those set forth in subsection (a). Only after a defendant is found guilty of that offense do the factors listed in subsections (c) through (j) come into play, potentially increasing the minimum sentence from one to either three or five years but leaving the maximum sentence at 20 years.[3] The "living in the same household" fact that triggers a three-year mandatory minimum sentence under OCGA § 16-5-21 (j) is therefore only a sentencing factor, not an essential element of the offense. See *United States v. O'Brien*, 560 U. S. 218 (130 SCt 2169, 2175, 176 LE2d 979) (2010) (discussing how to analyze whether the legislature meant a given fact to be an element of the crime itself or only a sentencing factor). Our contrary conclusion in *Hall* is hereby overruled.

Accordingly, the aggravated assault offense of which Appellant was convicted — an assault with a deadly weapon, see OCGA § 16-5-21 (a) (2) — has no element different than his malice murder offense, so it is not a separate offense as a matter of law. See *Culpepper v. State*, 289 Ga. 736, 738 (715 SE2d 155) (2011). Moreover, the aggravated assault charged — Appellant's shooting the victim with a handgun — was the same, rather than distinct from, the aggravated assault that resulted in her death. See id. at 738-739 (explaining that a non-fatal aggravated assault and a fatal aggravated assault that are separated by a "deliberate interval" may support separate convictions and

---

the court while such officer is engaged in, or on account of the performance of, his or her official duties." Ga. L. 2010, p. 999, § 1. However, the General Assembly did not amend subsection (b) to reflect this addition (that is, to change the reference there to "subsections (c) through (k)" to read "subsections (c) through (l)"). We do not address subsection (l) further in this opinion, but we bring this apparent omission to the attention of the legislature.

[3] Because these factors (unlike subsection (k)) do not increase the statutory *maximum* sentence for the crime, they are not constitutionally required to be considered elements that must be found by the jury beyond a reasonable doubt under *Apprendi v. New Jersey*, 530 U. S. 466, 490 (120 SCt 2348, 147 LE2d 435) (2000) – assuming that the Supreme Court's decision in *Harris v. United States*, 536 U. S. 545 (122 SCt 2406, 153 LE2d 524) (2002) (facts raising the mandatory *minimum* sentence do not come under the *Apprendi* rule), remains good law. But see *Alleyne v. United States*, ___ U. S. ___ (133 SCt 420, 184 LE2d 252) (2012) (granting certiorari to consider whether *Harris* should be overruled).

sentences). Appellant's aggravated assault conviction therefore merged into his murder conviction, and his separate sentence for aggravated assault must be vacated.

(d) Sufficient evidence supported Appellant's two third-degree child cruelty convictions. See OCGA § 16-5-70 (d) (1). The trial court directed a verdict of not guilty on the battery count of the indictment, which specifically alleged that Appellant had bruised King's face by slamming her head against a wall, because there was no evidence of that battery. However, the child cruelty counts did not specify what battery Alexis and Malik had witnessed, and there was evidence that each child had seen Appellant batter their mother. Alexis testified that she had witnessed Appellant hit her mother on numerous occasions that morning and that Malik had witnessed Appellant hit King just before Malik tried to hand her the knife.

(e) Finally, the evidence was also sufficient to support Appellant's conviction for tampering with evidence by removing the murder weapon from the crime scene and throwing it out the car window on the way to the hospital. However, the trial court erred in imposing felony punishment on this count. Only tampering with evidence "involving another person" is a felony offense, see OCGA § 16-10-94 (c); tampering with the evidence in one's own case is punishable as a misdemeanor. See OCGA §§ 16-1-10; 16-10-94 (a); *DeLeon v. State*, 289 Ga. 782, 782-783 (716 SE2d 173) (2011). Accordingly, Appellant's sentence on the tampering with evidence count must be vacated and the case remanded for resentencing on that count.

2. Appellant contends that the trial court erred in denying his motion to strike for cause prospective juror number 31, requiring him to use a peremptory strike to remove her from the trial jury. During voir dire, Juror 31 said that her sister, niece, cousin, and her cousin's children had been victims of domestic violence and that her college roommate's father had been murdered. When asked if anything about these incidents would make it difficult for her to be fair and impartial in deciding this case, the prospective juror answered, "Possibly," but added that she "would strive to be impartial." She also acknowledged that these experiences "would make it somewhat challenging" to be impartial, but again she said that she would "try to do [her] best to be an impartial juror."

> The decision whether to strike a prospective juror for cause lies within the trial court's discretion and will not be disturbed unless it is shown that the juror's opinion "is so fixed and definite that [he] will be unable to set the opinion aside and decide the case based upon the evidence" and the trial court's instructions. Neither a prospective juror's doubts as

to his ability to be impartial nor his statement that he will "try" to set aside any preconceived notions mandate as a matter of law that he be excused for cause.

*Miller v. State*, 275 Ga. 730, 736 (571 SE2d 788) (2002) (citations omitted). Because Juror 31 expressed her intention to be an impartial juror and did not express a fixed or definite opinion about Appellant's guilt, we cannot say that the trial court abused its broad discretion in declining to strike her for cause.

3. Appellant next argues that the trial court erred in admitting his various statements to the police on the day King was killed, as well as the physical evidence (the murder weapon) obtained as a result of those statements. He contends that his statements were made involuntarily because he was in police custody but was not advised of his constitutional rights as required by *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

A person is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary.

*Sewell v. State*, 283 Ga. 558, 560-561 (662 SE2d 537) (2008) (citations omitted). "In reviewing a ruling on the admissibility of a defendant's statements where the facts are disputed, we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the law to the facts." *Schutt v. State*, 262 Ga. 625, 629 (740 SE2d 163) (2013).

The record shows that Appellant was initially interviewed by an officer in a break room at the hospital, where he was waiting with the victim's three children. The officer testified that Appellant was not yet a suspect and was free to leave at any time and that Appellant freely spoke with him and a detective who arrived later. Appellant volunteered that he had thrown the gun out of the car on the way to the hospital, and he offered to take the police to that location. When they drove there in a police car, the officer told Appellant that he was not under arrest, and he was not handcuffed. Another officer testified that, after the gun was found, Appellant agreed to be interviewed at the police station. He was interviewed in an unlocked witness interview room, with the children in a room next door. Appellant was again told that he was not under arrest, and he was not handcuffed. The

officer testified that Appellant cooperated completely, willingly giving a written statement and then answering additional questions. Only at the end of the interview was Appellant arrested.

The record supports the trial court's findings that Appellant was not prohibited from leaving the hospital or police station and that he voluntarily went to the police station, where he was interviewed pursuant to the normal procedures for interviewing witnesses. And we see no error in the trial court's conclusion that Appellant was not in custody when he made his statements to the police, that the statements were made voluntarily, and that the statements and the resulting physical evidence were therefore properly admissible at trial.

4. Appellant contends the trial court committed reversible error in allowing the prosecutor to make the following statement during closing argument:

> If those kids were not in the house, I submit to you that [Appellant] would be down in Mexico somewhere. He would have drove past California, took [the victim's] car, and been in Mexico. We wouldn't be hearing from him.

Appellant objected to this argument on the ground it was not a reasonable inference to draw from the evidence, but the objection was overruled. Appellant asserts that this argument injected prejudicial matters into the trial that had no basis in the evidence.

> [A] prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion; within the scope of such latitude is the prosecutor's ability to argue reasonable inferences from the evidence, including any that address the credibility of witnesses.

*Scott v. State*, 290 Ga. 883, 885 (725 SE2d 305) (2012). See also *Varner v. State*, 285 Ga. 300, 301 (676 SE2d 189) (2009) (noting that counsel have " 'wide leeway . . . to argue all reasonable inferences that may be drawn from the evidence during closing argument' " (citation omitted)). However, counsel may not make statements to the jury "of prejudicial matters which are not in evidence." OCGA § 17-8-75.

In this case, Appellant argued in closing that his claim that the victim committed suicide was supported by the fact that he took her to the hospital and cooperated with the police. It was not unreasonable for the prosecutor in rebuttal closing to suggest to the jury that Appellant would instead have simply fled the scene had the victim's children not been in the house at the time she was killed. The

extension of that argument to the concrete detail of Appellant's driving through California to remain a fugitive in Mexico may have gone too far, but any error in allowing that embroidery would not require reversal. The core of the prosecutor's argument was a reasonable inference drawn from the evidence; the argument clearly did not inject facts not in evidence (as it was obvious from the evidence that Appellant had not in fact driven to Mexico and become a fugitive), so OCGA § 17-8-75 is not applicable; the court instructed the jury that the lawyer's arguments were not evidence; and the evidence of Appellant's guilt was overwhelming. We therefore conclude that, to the extent this closing argument may have crossed the line, it is highly probable that it did not contribute to the verdict. See *O'Neal v. State*, 288 Ga. 219, 223 (702 SE2d 288) (2010).

5. Appellant next complains that the trial court erred in refusing to give the jury charges he requested on prior inconsistent statements, mutual combat, and involuntary manslaughter. However, Appellant has not supported these alleged errors with any relevant argument or citation of authority, and the claims are therefore deemed abandoned under Supreme Court Rule 22. See *Green v. State*, 291 Ga. 287, 292 (728 SE2d 668) (2012). Moreover, our review of the record has revealed no merit to these claims.

6. Finally, Appellant asserts that his trial counsel provided constitutionally ineffective assistance. To prevail on this claim, Appellant must show that his counsel's performance was professionally deficient and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more favorable to him. See *Strickland v. Washington*, 466 U. S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). The reviewing court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

(a) Appellant claims first that his trial counsel was ineffective in failing to file a pre-trial motion to suppress the results of the gunshot residue test performed on his hands, and then failing to object at trial to the admission of that evidence, because the test was performed without valid consent or a search warrant. However, " '[s]wabbing the hands of an accused to lift gunshot residue does not constitute an unconstitutional search or seizure.' " *Jones v. State*, 277 Ga. 36, 38 (586 SE2d 224) (2003) (citation omitted). Thus, a motion to suppress the gunshot residue swabs and an objection to the admission of the residue test results at trial would have been meritless, and the failure to make a meritless motion or objection cannot constitute ineffective assistance of counsel. See *Rios v. State*, 281 Ga. 181, 183 (637 SE2d 20) (2006).

(b) Appellant also claims that his trial counsel was ineffective in failing to object to the prosecutor's improper personal comments during closing argument. In response to Appellant's defense that the victim had committed suicide with her three young children in the house, the prosecutor argued as follows:

Why would — ask yourself, why would [the victim] kill herself? Her children were just coming over to the house. That makes no sense at all. The children did not live with her. . . . She could have done it before the kids came over.

. . . Think about it, the ones that have children, and you go back there in the jury room and talk to the people that don't. That is not something, as a parent, that you would do.

You won't have your kids, who don't even live with you in your own house, you won't have them there and you decide that you're going to put a bullet in your head at the end of the day. Now, use your common sense and good judgment.

And for me, this is personal. This is something personal, because I've dealt with a father that committed suicide. My father committed suicide 27 years ago, but he did not do it in front of the children. He did not do it. We were not at the house, and the gunshot was not the left side, the gunshot was on the right side and it was a close range shot.

Think about your own life experiences. It just does not make sense. My father wouldn't have ever had children in the house to have committed suicide, and we were five years old at the time when it happened.

So I ask that you go back in there and you think about your life experiences. You think about what makes sense. Does it make sense that this lady would kill herself in front of her children who she has a good relationship with? I submit to you that is not the case.

Appellant focuses on the fourth and fifth paragraphs of this argument, and he is correct that the statements there relating the details of the prosecutor's personal experience with the emotion-charged issues of suicide — not merely to illustrate some point of law or commonplace occurrence, but rather to convince the jury from her particular experience that Appellant's story was factually incredible — were improper. See *Wyatt v. State*, 267 Ga. 860, 864 (485 SE2d 470) (1997) (holding that a prosecutor may not state a personal opinion about the defendant's guilt). However, the thrust of this argument as a whole — inviting the jury to use its collective common sense and life

experience to question the plausibility of Appellant's story — was appropriate. See *Robinson v. State*, 257 Ga. 194, 196 (357 SE2d 74) (1987). And we cannot say that the prosecutor's ill-advised reference to her own experience had a reasonable probability of changing the outcome of the trial, particularly given the overwhelming evidence of Appellant's guilt, including the forensic evidence undermining his claim that the victim shot herself. Thus, pretermitting whether trial counsel's failure to object to that portion of the State's closing argument was professionally deficient, the argument was not prejudicial, and this ineffective assistance of counsel claim also fails.

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur, except Hunstein, C. J., who concurs in the judgment only as to Division 6 (b).*

DECIDED JUNE 3, 2013.

*Kenneth W. Sheppard*, for appellant.
*Robert D. James, Jr., District Attorney, Leonora Grant, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General*, for appellee.