306 Ga. 391
FINAL COPY

S19A0166.  VENTURINO v. THE STATE.

WARREN, Justice.

Ruiz Suchiapa Venturino was convicted of felony murder and
other crimes in connection with the shooting death of Marcos Cruz.[1]
On appeal, Venturino contends that the trial court erred in several
ways.  Finding no reversible error, we affirm.

1.     Viewed in the light most favorable to the jury's verdicts,

---

[1] The murder was committed on June 30, 2013.  On September 25, 2013,
a Chatham County grand jury indicted Venturino for malice murder (Count 1),
felony murder predicated on aggravated assault (Count 2), possession of a
firearm during the commission of Cruz's murder (Count 3), aggravated assault
of Cruz (Count 4), possession of a firearm during the commission of the
aggravated assault of Cruz (Count 5), aggravated assault of David Sanchez
(Count 6), and possession of a firearm during the commission of the aggravated
assault of Sanchez (Count 7).  At the conclusion of a trial held from April 14-
20, 2015, a jury found Venturino not guilty of Counts 6 and 7 against Sanchez,
but guilty of felony murder and the remaining counts, except for malice
murder.  On June 2, 2015, the trial court sentenced Venturino to a life sentence
for felony murder and a consecutive five-year sentence for possession of a
firearm during the commission of the murder; the remaining counts were
merged for sentencing purposes.  Venturino filed a timely motion for new trial
on June 5, 2015, which was later amended.  Following a hearing, the trial court
denied the motion, as amended, on July 25, 2018.  Venturino filed a timely
notice of appeal, and the case was docketed in this Court to the term beginning
in December 2018 and submitted for a decision on the briefs.

the evidence presented at trial showed the following. On June 29, 2013, Marcos Cruz and his son-in-law, David Sanchez, went to a bar in Savannah. While they were there, Venturino and his friend, Mayra Gomez, arrived and sat at the bar with Cruz and Sanchez. Cruz and Venturino knew each other; they were former co-workers who had previously enjoyed a good working relationship, but that relationship had deteriorated into one of animosity after Venturino disparaged his ex-girlfriend, Candelaria Sanchez (whom Cruz treated like a daughter[2]), by saying she was promiscuous. Venturino ended up leaving Gomez at the bar, and Sanchez and Cruz gave Gomez a ride to her apartment in the early morning hours of June 30, 2013. Sanchez drove; Cruz sat in the passenger seat; and Gomez sat in the back. Cruz fell asleep on the way to Gomez's apartment.

When the group arrived at Gomez's apartment complex, Sanchez saw Venturino's vehicle there. Gomez got out and walked to her apartment, where she and Venturino began arguing outside.

---

[2] Candelaria Sanchez was David Sanchez's sister, and she had previously cared for Marcos Cruz's then-young daughter, Carmen Cruz, who later married David Sanchez.

The two went into Gomez's apartment, but Venturino came back out, approached Sanchez's vehicle looking angry and upset, and began yelling at Cruz to get out of the car. Sanchez told Venturino "to just talk things out when they were sober, not drunk," but Venturino kept shouting at Cruz, who remained asleep in the car. Venturino then pulled out a gun from behind his back, opened the passenger door, and shot Cruz twice. Before Venturino shot him, Cruz did not say anything to Venturino and did not make any kind of movement or motion. Venturino then walked back toward Gomez's apartment. Venturino knocked on the door and calmly told Gomez that he had shot Cruz and sent him "to hell." Venturino also told Gomez that he had "screwed up [his] life." Venturino never said anything to Gomez about acting in self-defense. Meanwhile, Sanchez took Cruz to the hospital, where Cruz died.

While the police were still at the murder scene that night, Venturino returned to the scene and was arrested. Police found a .38 revolver at the scene. During the later investigation, Gomez told police that on the night of the shooting, Venturino had calmly told

her that Cruz had insulted and offended him, and Venturino shot Cruz. When police processed Sanchez's car, the front-passenger seat was heavily covered in blood. They discovered a hole in the seat and recovered two bullets that a firearms examiner later determined were fired from the .38 revolver recovered at the scene. Also, at the time of Cruz's autopsy, Cruz had a blood-alcohol concentration of 0.238 grams per 100 milliliters, and the medical examiner testified that "in general an individual at a .238 probably would be sleepy or asleep, possibly difficult to arouse." The medical examiner further opined that the path that the bullets took through Cruz's body was consistent with the shooter standing over him as he sat.

At trial, Venturino testified that earlier at the bar, Cruz insulted him to provoke him and threatened his life. He further testified that when he arrived at Gomez's apartment complex, Sanchez's car was already there and Sanchez was standing outside of it. Venturino saw Gomez exit and then re-enter her apartment, at which point Venturino began walking toward her apartment. As he passed Sanchez's vehicle, Venturino waved to Sanchez, but then

Cruz — who Venturino did not know was in the vehicle — opened the front-passenger door. Venturino claimed that Cruz then said, "he had come to get me. That he was going to take away my life and that he was going to throw me in the river." According to Venturino, Cruz appeared to be reaching for a weapon, so Venturino shot him twice in self-defense because he feared for his life.

Venturino does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Venturino guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Crews v. State*, 300 Ga. 104, 105-106 (793 SE2d 393) (2016).

2.    Venturino contends that the trial court committed the following evidentiary errors: prohibiting the defense from

questioning David Sanchez about portions of a phone conversation in which Venturino told Sanchez that Venturino shot Cruz in self-defense; allowing the State to introduce a gruesome autopsy photograph; allowing the State to introduce photographs of a machete and baseball bat found in the back of Venturino's vehicle; and allowing Candelaria Sanchez to testify about conversations she had with Cruz regarding disparaging things Venturino said about her. "We review a trial court's evidentiary rulings under an abuse of discretion standard of review." *Williams v. State*, 302 Ga. 474, 478 (807 SE2d 350) (2017) (citation and punctuation omitted). And even where an abuse of discretion is shown, there are no grounds for reversal if the error did not affect a "substantial right," and thus harm, the defendant. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . ."); see also *Smith v. State*, 299 Ga. 424, 431 (788 SE2d 433) (2016) (OCGA § 24-1-103 (a) "continues Georgia's existing harmless error doctrine for erroneous evidentiary rulings"). "'In determining whether the error was

harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so,'" and we assess "'whether it is highly probable that the error did not contribute to the verdict.'" *Smith*, 299 Ga. at 432 (quoting *Rivera v. State*, 295 Ga. 380, 382 (761 SE2d 30) (2014)).  With these standards in mind, we address Venturino's claims of evidentiary error.

(a)    At trial, the State questioned Sanchez about a portion of a phone conversation he had with Venturino after the shooting, wherein Venturino asked Sanchez if he was alone and if they could meet alone to talk.  The trial court then prohibited Venturino from questioning Sanchez further about Venturino's statement during that phone call that he shot Cruz because "[Cruz] was going to kill me."  Venturino argues that the trial court erred when it made that ruling.    However, pretermitting whether the court's denial of Venturino's request to elicit this testimony was an abuse of discretion, we conclude — after reviewing the record as a whole — that any error was harmless.

To begin with, when Venturino testified in his own defense, the

jury heard his version of events — including testimony that Venturino shot Cruz in self-defense because Cruz threatened to kill Venturino and appeared to be reaching for a weapon. Sanchez's statement that Venturino told Sanchez over the phone that Cruz was going to kill him was at least "somewhat cumulative" of Venturino's own testimony on that point. *Walker v. State*, 306 Ga. ___ (___ SE2d ___) (2019). Moreover, the State never again mentioned to the jury Venturino's request to meet with Sanchez alone, indicating that it was not a significant component of the proof against Venturino. And most importantly, the evidence showing that Venturino acted with criminal intent when he shot Cruz as Cruz sat, asleep and impaired, in Sanchez's car, was overwhelming. *Westbrook v. State*, 291 Ga. 60, 62-63 (727 SE2d 473) (2012) (any error in admitting hearsay evidence of defendant's guilt under the rule of completeness was harmless in light of other, overwhelming evidence of defendant's guilt). That evidence included Sanchez's testimony that Cruz was seated and passed-out drunk when Venturino shot him, which was corroborated by forensic evidence

showing that Cruz's blood-alcohol concentration was very high and likely would have rendered him unconscious, and that the trajectory of the bullets indicated that Cruz was shot by someone who stood over him as he sat. In addition, Gomez told police that Venturino told her that Cruz had insulted and offended him. She also told police that Venturino told her after the shooting that he had sent Cruz "to hell," while saying nothing about acting in self-defense. And Venturino admitted at trial that after the shooting, he told Gomez that he had "screwed up [his] life." Considering the entire record, we conclude that it is highly probable that any error in prohibiting further questioning of Sanchez did not contribute to the verdict, and was therefore harmless. This enumeration of error fails.

(b) Venturino argues that the trial court erred by allowing the State to introduce into evidence, over objection, an "overly gruesome" autopsy photograph. We disagree.

Venturino takes issue with a color autopsy photograph of Cruz's opened chest cavity, with organs removed and rods inserted

to approximate the trajectory of the bullets that struck him. Venturino contends that this photograph, which was introduced during the State's direct examination of the medical examiner who conducted Cruz's autopsy, was unduly prejudicial under OCGA § 24-4-403.

Under our new Evidence Code, the general admissibility of autopsy photographs is governed by OCGA § 24-4-401 ("Rule 401"), which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"; OCGA § 24-4-402 ("Rule 402"), which provides that "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules"; and OCGA § 24-4-403 ("Rule 403"), which provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence."  See also *Pike v. State*, 302 Ga. 795, 799-800 (809 SE2d 756) (2018) (affirming admission of autopsy photos that were "relevant to show the nature and location of the victim's injuries").  "Decisions regarding relevance are committed to the sound discretion of the trial court[,]" *Smith*, 299 Ga. at 429, and "'the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly.'"  *Pike*, 302 Ga. at 799 (quoting *Benton v. State*, 301 Ga. 100, 103 (799 SE2d 743) (2017)).

In arguing that the photograph here should not have been admitted, Venturino relies in part on the exclusionary rule announced by this Court in *Brown v. State*, 250 Ga. 862, 866 (302 SE2d 347) (1983), that "[a] photograph which depicts the victim after autopsy incisions are made or after the state of the body is changed by authorities or the pathologist will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy."  But today we make clear that the categorical rule announced in *Brown* has been abrogated by

our new Evidence Code. We note that in *Brown*, this Court explicitly stated that it took the "opportunity to announce a rule" about which autopsy "photos may be offered in evidence," and then proceeded to do so without citation to authority. Id. at 867. And although we cited two cases in reaching our holding in *Brown*, neither case concluded that the respective trial courts had committed reversible error in admitting graphic autopsy photographs, and neither relied on a statutory rule of evidence that would compel our holding in *Brown*. See *Williams v. State*, 250 Ga. 553 (300 SE2d 301) (1983); *Ramey v. State*, 250 Ga. 455 (298 SE2d 503) (1983). *Brown*, likewise, was not predicated on a statutory rule of evidence. Nor did we purport in *Brown* "to be reaffirming a common-law rule of evidence" in our proclamation of a new evidentiary rule. *State v. Orr*, 305 Ga. 729, 735 (827 SE2d 892) (2019). Instead, *Brown*, *Williams*, and *Ramey* evaluated the admissibility of autopsy photographs based on general principles of relevance and prejudice — considerations that are now specifically controlled by the new Evidence Code. See OCGA §§ 24-4-401, 24-4-402, and 24-4-403; see also *Orr*, 305 Ga. at

735 (noting that "the old Evidence Code had no provision addressing the exclusion of evidence as more prejudicial than probative"). Thus, the rule we announced in *Brown* was the type of judge-made, categorical evidentiary rule we disapproved in *Orr*. See *Orr*, 305 Ga. at 738.

Given this background, and because the applicable evidentiary rules in our new Evidence Code are modeled after the Federal Rules of Evidence, the rule in *Brown* "is no doubt . . . abrogated by the new Evidence Code." *Orr*, 305 Ga. at 736. We therefore disavow the application of the rule announced in *Brown*, and applied in its progeny, in cases governed by the new Evidence Code. To evaluate the admissibility of autopsy photos under Rules 401, 402, and 403, we instead rely on our cases decided under the new Evidence Code, and also look to federal case law for guidance. See *Orr*, 305 Ga. at 739 n.8.

Here, the medical examiner referenced the complained-of autopsy photograph at trial as he explained that the only way he could get the trajectory probes through Cruz's body (and thus

demonstrate the flight path of the bullets that passed through him) was in the manner depicted in the photograph. He further explained that the fact that he first needed to remove certain organs to position the probes through the bullet holes was "very consistent . . . with somebody who had been sitting when they got these wounds"; that this was the only way to accurately demonstrate the precise flight path of the bullets; and that "while it's not pleasant to look at, it's necessary in order to understand how the bullets went through his body." Although the photograph was relatively gruesome, the record shows that it depicted the "only way" the medical examiner could insert the trajectory probes to "accurately" show the precise path that the bullets travelled through Cruz's body — a point that was made to support the State's theory that Cruz was sitting when he was shot. Moreover, the medical examiner's explanation of the autopsy photo was also consistent with Sanchez's testimony that Cruz was seated and asleep when Venturino stood over him and shot him. See, e.g., *Pike*, 302 Ga. at 799-800 ("The challenged photographs . . . were relevant to show the nature and location of

the victim's injuries, which corroborated the State's evidence of the circumstances of the killing."); *Moss v. State*, 298 Ga. 613, 617-618 (783 SE2d 652) (2016) ("The photos and related testimony were relevant to show the nature and location of the victim's injuries, which corroborated the account of the shooting given by . . . eyewitnesses."). Indeed, the examiner went so far as to say that the photograph was "*necessary* in order to understand how the bullets went through [Cruz's] body." (Emphasis supplied.) Based on the foregoing, we conclude that the trial court did not abuse its discretion when it ruled that the photograph was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice.[3]

(c) Venturino argues that the trial court erred by allowing the State to introduce into evidence, over objection, photographs of a machete and baseball bat that law enforcement found in the back

---

[3] Venturino also makes a strained argument that the lead detective's testimony that a knife found in Sanchez's home was undisturbed and appeared clean was improper opinion testimony, but this enumeration is meritless.

of his vehicle when he was arrested. Pretermitting whether the court's admission of that evidence was an abuse of discretion, any error was harmless because the baseball bat and machete were never mentioned again during trial, and as described above in Division 2 (a), the evidence of Venturino's guilt was overwhelming. Compare *Davis v. State*, 301 Ga. 397, 400 (801 SE2d 897) (2017) (any error in allowing evidence that defendant possessed a handgun was harmless in light of the strong evidence of defendant's guilt), with *Nichols v. State*, 282 Ga. 401, 403-405 (651 SE2d 15) (2007) (defendant harmed by erroneous admission of firearms and ammunition into evidence where the items were unrelated to the crime; where the State argued in closing that the evidence showed defendant's propensity for violence and killing; and where there was substantial evidence that the victim was the actual aggressor). This enumeration of error also fails.

(d) Venturino argues that the trial court erred by allowing Candelaria Sanchez to testify about statements Cruz made to her about disparaging remarks Venturino had made about her.

Pretermitting whether the court's admission of this evidence was an abuse of discretion, any error was harmless because, as described above in Divisions 2 (a) and (c), the evidence of Venturino's guilt was overwhelming. See *Virger v. State*, 305 Ga. 281, 294 (824 SE2d 346) (2019) (where there was strong evidence of defendant's guilt, alleged error in permitting witness to testify that defendant cursed her out was harmless).

Venturino also argues that the trial court erred by denying his motion for a mistrial related to the Candelaria Sanchez testimony referenced above. But the decision to grant or deny a mistrial "is within the sound discretion of the trial court" and "will not be disturbed unless it resulted from a manifest abuse of that discretion." *Taylor v. State*, 303 Ga. 225, 229 (811 SE2d 286) (2018) (citations and punctuation omitted). We discern no manifest abuse of discretion here. Despite the State's repeated efforts to elicit from Candelaria testimony about what "specific words" Venturino called her, she would only generally affirm that Venturino had used specific words that disparaged her and never stated what specific

words he actually used.  See *Robinson v. State*, 298 Ga. 455, 460 (782 SE2d 657) (2016) (no mistrial warranted where "the inadmissible testimony about which [the defendant] complains only alludes to a hearsay statement about an accomplice that was never admitted into evidence").  And viewing the relatively benign testimony that Venturino had made disparaging remarks about Candelaria in the context of the overwhelming evidence of Venturino's guilt, we cannot say that the court abused its discretion in denying Venturino's motion for a mistrial.  See *Taylor*, 303 Ga. at 229 (noting that "[w]hen determining whether the trial court abused its discretion" in ruling on a motion for mistrial, we consider, among other things, "the statement itself, [and] other evidence against the accused") (citation and punctuation omitted).

3.  Venturino contends that the trial court erred by refusing his request to charge the jury on mutual combat.  We disagree.

"To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge.  Whether the evidence presented is sufficient to authorize the giving of a charge

is a question of law." *Green v. State*, 302 Ga. 816, 818 (809 SE2d 738) (2018) (citation and punctuation omitted). "'Mutual combat occurs when there is combat between two persons as a result of a sudden quarrel or such circumstances as indicate a purpose, willingness, and intent on the part of both to engage mutually in a fight.'" *Carruth v. State*, 290 Ga. 342, 348 (721 SE2d 80) (2012) (quoting Ga. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.10.43) (if the jury "find[s] that there was mutual intention on the part of both the deceased and the defendant to enter into a fight or mutual combat and that under these circumstances the defendant killed the deceased, then ordinarily such killing would be voluntary manslaughter")).

Venturino points to no record evidence that he and Cruz intended to engage in mutual combat, and we can find none. To the contrary, Sanchez testified that Venturino shot Cruz as Cruz slept in the passenger seat of Sanchez's car. And Venturino's own testimony — in which he claimed self-defense — contradicted a theory of mutual combat. "[T]he scenario described by appellant

supports an instruction on self-defense, which the trial court gave, but not a mutual combat charge." *Berrian v. State*, 297 Ga. 740, 743 (778 SE2d 165) (2015). This enumeration of error fails.

4. Venturino argues that the trial court erred by failing to rebuke the prosecutor when she misstated the law regarding voluntary manslaughter during closing argument. We again disagree.

Specifically, Venturino complains about the prosecutor stating during closing argument:

> [M]y belief is that [defense counsel] is going to raise what we call in the law affirmative defenses. Meaning he's going to admit [Venturino] shot and killed Marcos Cruz and that he did so when David Sanchez was sitting right there.
>     But he's claiming that [Venturino] was either justified in doing that, self defense, or something mitigated it. Meaning there was offensive things or all this was so sudden. You know, it's not as bad. It's not a murder. Give me voluntary manslaughter. So he's either trying to outright say this is A okay. I had to do what I did. Don't convict me at all. Or mitigate it saying again there [were] reasons I did this. And they were good ones. Do [sic] don't have it be a murder. Have it be a voluntary manslaughter. So when somebody, a defendant, somebody charged with a crime raises those types of defenses, self defense —

At that point, Venturino's trial counsel objected: "This is misstated. Voluntary manslaughter is not an affirmative defense. And the way she's phrased that argument, she's misstated the law." The court responded by informing the jury, "I will be charging you on what the law is in this case," and allowing the prosecutor to continue her closing argument. Immediately thereafter, the prosecutor clarified that voluntary manslaughter is not an affirmative defense by noting that the State has the burden of disproving affirmative defenses beyond a reasonable doubt, and acknowledging, "I have to do that on a self defense. On a voluntary manslaughter it's all up to you." Similarly, the State distinguished between the two during the remainder of closing argument, specifically noting that they are "two different legal principles," and arguing against the application of each in turn.

On appeal, Venturino argues that the prosecutor misstated the law by stating that voluntary manslaughter is an affirmative defense, and that this misstatement ran afoul of OCGA § 17-8-75's

prohibition on "statements of prejudicial matters which are not in evidence." Venturino contends that under OCGA § 17-8-75, the trial court was required to "rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds," and that the trial court therefore erred by overruling counsel's objection.

We do not view the prosecutor's statements as falling within the statutory prohibition against "statements of prejudicial matters which are not in evidence." See OCGA § 17-8-75. See *Kirkland v. State*, 271 Ga. 217, 219-220 (518 SE2d 687) (1999) ("[C]ounsel may still discuss, or even argue, during closing arguments the law that will be included in the court's charge." (citation and punctuation omitted)). The comments that Venturino complains about were, at most, a misstatement of the law and therefore outside the purview of OCGA § 17-8-75. See *Durden v. State*, 293 Ga. 89, 97 (744 SE2d 9) (2013) ("[T]he [prosecutor's] argument clearly did not inject *facts* not in evidence . . . so OCGA § 17-8-75 is not applicable." (emphasis supplied)), overruled on other grounds by *Jeffrey v. State*, 296 Ga.

713, 718 (770 SE2d 585) (2015). And although attorneys are not permitted to misstate the law to the jury, any error here was harmless. Even though the prosecutor may have been unclear about the distinction between voluntary manslaughter and the affirmative defense of self-defense in the inarticulate closing-argument excerpt Venturino highlights, the prosecutor then corrected herself and clarified the difference between the two legal concepts in later portions of closing argument. Moreover, the court charged the jury separately and correctly on self-defense and voluntary manslaughter, and we presume that jurors follow the law. See *McKie v. State*, 306 Ga. 111, 115 (829 SE2d 376) (2019) ("[T]he jury is presumed to follow the court's instructions."); *Ware v. State*, 302 Ga. 792, 794 (809 SE2d 762) (2018) ("In light of the substantial evidence of guilt in this case, as well as the trial court's jury instructions, it is highly probable that neither this statement by the prosecutor in closing argument, nor any alleged failure of the trial court to comply with OCGA § 17-8-75, contributed to the verdict." (citation and punctuation omitted)). As a result, this enumeration

of error fails.

*Judgment affirmed. All the Justices concur.*

Decided June 24, 2019 – Reconsideration dismissed July 11, 2019.

Murder. Chatham Superior Court. Before Judge Freesemann.

*Steven L. Sparger*, for appellant.

*Meg E. Heap, District Attorney, Bradley R. Thompson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.