S06A1649. CONWAY v. THE STATE.
S06A1650. BATES v. THE STATE.
(642 SE2d 673)

HINES, Justice.

These appeals arise from criminal prosecutions in connection with the deaths of Timothy Hale and Rhonda Warren. In Case No. S06A1649, Katherine Melissa Conway ("Conway") appeals from her convictions for two counts of malice murder, and in Case No. S06A1650, Keane Alan Bates ("Bates") appeals from his convictions for two counts of malice murder. For the reasons that follow, we affirm in both cases.[1]

Construed to support the verdicts, the evidence showed that until June 1995, Conway was the girlfriend of victim Hale; they broke up, but Conway attempted to renew the relationship. However, Hale began a relationship with Warren. On September 29, 1995, Conway and two female friends came to the trailer park where Hale lived. Conway stated that "we're going to kick [Warren's] ass." The women then rushed into Hale's trailer, but Hale prevented them from reaching Warren.

Hale and Warren were seen by a neighbor at 1:00 p.m. on Saturday, November 4, 1995; that evening, and again on Sunday, they did not answer telephone calls to the trailer, or knocks at the door. Their bodies were discovered on Monday morning, November 6, 1995. They had been killed by gunshots to the head. Forensic evidence showed that they were seated on a sofa bed when shot, and their bodies were then moved to prone positions on the bed.

Testimony concerning the details of Conway's and Bates's involvement in the murders is not identical in every respect, but it showed that David Arlen Bates ("David"), the father of defendant

---

[1] Hale and Warren died on November 4, 1995. On November 3, 1998, a Richmond County grand jury indicted Conway and Bates, together with Richard Scott Breedlove and David Arlen Bates ("David"), for the crimes of malice murder of Hale, felony murder of Hale while in the commission of aggravated assault, malice murder of Warren, felony murder of Warren while in the commission of aggravated assault, and possession of a firearm during the commission of the crime of murder; in the same indictment, David was also charged with criminal solicitation to commit murder. Conway and Bates were tried before a jury July 7-11, 2003. Each was found guilty of both malice murder counts, and not guilty on all other charges. On August 6, 2003, both were sentenced to two consecutive terms of life in prison. Conway moved for a new trial on August 15, 2003, and amended her motion on July 13, 2004; her motion was denied on September 14, 2005, and she filed her notice of appeal on October 13, 2005. Bates moved for a new trial on August 7, 2003, and amended his motion on February 22, 2006; his motion was denied on March 23, 2006, and he filed his notice of appeal on April 3, 2006. The consolidated appeals were docketed in this Court on June 1, 2006, and argued on September 19, 2006.

Alan Bates, assisted in the hiring of Richard Scott Breedlove ("Breedlove") to kill Hale.[2] Bates hired Breedlove after Bates and Conway developed a romantic relationship.

Specifically, David testified that: on Friday, November 3, 1995, Bates told David that he was "going to kill" a man named Tim, and asked to be put in touch with Breedlove, who was a dealer of illegal drugs; Conway was positioned where she could hear the conversation; David located Breedlove and told him that Bates wanted to see him about "some trouble with somebody"; Breedlove asked if Bates wanted the person's "butt kicked," and David said that Bates was saying that he wanted the person killed; late the next evening, David was at the home of Donna Szatkowski, a paramour of his; Bates and Conway arrived, and while Conway remained in the living room, Bates went into the bedroom where David was; David asked Bates "did you get your problem solved? He taking care of it?"; Bates responded, "Yeah, they're dead"; David asked who was dead, and Bates responded "Tim" and "Rhonda"; Breedlove arrived, went to the bedroom where Bates and David were, and said that he had "agreed to help" Bates because of Breedlove's relationship with David; David exited the room, and when he returned, heard the sum of $700 discussed; David saw Conway washing her shirt in the sink; during the next week, Breedlove telephoned David and said that Bates owed him $7,500 for a loan; Bates told David it would "look good" if David went to Warren's funeral; and while incarcerated, Bates told David that it would be Breedlove that would get a deal, not David, and that David should accept responsibility for the crimes to allow Bates "a life."

Breedlove testified that: he was approached by David and Bates, and told that they "had a job" for him to do; he took this to mean either that they wanted someone beaten, or killed, and "[t]hey didn't act like they wanted to have him beaten up"; the sum of $4,000 was agreed upon; Conway participated in the discussion about the "job"; he went to Hale's trailer with two pistols; he committed the murders at about 8:30 p.m. on November 4, 1995; he went to Bates's tattoo parlor, and discussed payment; Conway was at the tattoo parlor at this time; he then went to Szatkowski's home; and he later told police that "the girl with Alan Bates" said that shooting the bodies "made [her] quiver like a fish."

Szatkowski testified that Conway told her that she wanted her former boyfriend dead, and that "someway, somehow, I'm going to

---

[2] In 2001, Breedlove pled guilty to burglary, malice murder, felony murder, and possession of a firearm during the commission of a crime, and David pled guilty to criminal solicitation to commit murder.

have him fixed to where he's not going to bother me anymore." Szatkowski also heard conversations between Bates, David, and Conway that it would take $5,000 to have "Tim taken out." When Breedlove entered Szatkowski's home after the murders, he said "[t]he whole damn thing's been blown all to pieces. . . . It was supposed to be one person. There was two people there. Kathy wasn't even supposed to be there." When Bates and Conway arrived at Szatkowski's home, there were brown stains on Conway's shirt. And, Conway told Szatkowski "this was better than an orgasm, watching them get blown away."

A friend of Conway's, Linda Mora, testified that, the night of the murders, Conway said that "they had done it . . . that [Tim] and [Rhonda] were dead."

## Case No. S06A1649

1. Conway asserts that the evidence adduced at trial was insufficient to sustain guilty verdicts of malice murder. More specifically, she argues that there was insufficient evidence to show that she was a party to these crimes. A party to a crime is one who intentionally aids or abets the commission of the crime, or intentionally advises, encourages, hires, counsels, or procures another to commit the crime. OCGA § 16-2-20 (b) (3), (4). "Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime." (Citation and punctuation omitted.) *Hewitt v. State*, 277 Ga. 327, 329 (1) (a) (588 SE2d 722) (2003).

Conway contends that the evidence showed nothing more than that she was present when Bates and Breedlove discussed the murders, but did not participate in the killings, or any planning for them. However, the record belies this contention. There was testimony that: she had previously acted violently toward Hale and Warren, expressing the desire and intention that Hale die; she participated in at least one conversation planning the murders; she was at the scene of the murders; she washed brown stains off her shirt after their commission; and she told two people of the murders before the bodies were discovered. There was ample evidence for the jury to find that Conway was at least a party to these crimes. *Hewitt*, supra.

Nonetheless, Conway asserts that Breedlove's testimony must be discounted, because he confused her and Szatkowski in his testimony. The portion of his testimony to which Conway refers is that where he states that he met Bates at Bates's house that "turned out later to be her house." When asked for clarification, Breedlove said he had later been informed the house was Conway's or Szatkowski's, "one of the two." However, this merely shows that he was uncertain

of the ownership of the house, which is reinforced by his later reference to the house with the phrase, "whoever owns it, I don't know." Further, Breedlove knew Szatkowski for "a couple of years" before the murders, and Conway for "months" before their commission, also indicating that he knew which woman was which. In any event, any such confusion was for the jury to resolve, and it was authorized to find that Breedlove knew which woman was Conway when he named her in his testimony.

Conway also argues that the fact that the jury did not convict her of conspiring to commit a crime, see OCGA § 16-4-8, shows that the jury did not believe her to have been involved in the killings. First, Conway did not request that the jury be instructed it could find the offense of conspiracy to commit a crime, and no such option was placed on the verdict form; the trial court's instruction on conspiracy was in the context of the jury's use of the statements of co-conspirators. See OCGA § 24-3-5. Second, even if the jury had rejected a conspiracy offense, it does not aid Conway as "Georgia has rejected the inconsistent verdict rule, [and] 'a defendant cannot attack as inconsistent a jury verdict of guilty on one count and not guilty on a different count.' [Cit.]" *Lawrence v. State*, 274 Ga. 794 (2) (560 SE2d 17) (2002). The only question is whether the evidence was sufficient to sustain convictions for the crimes of which Conway was convicted. *Kolokouris v. State*, 271 Ga. 597, 598 (2) (523 SE2d 311) (1999). And, the evidence was sufficient to enable a rational trier of fact to find Conway guilty beyond a reasonable doubt of both malice murders. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court instructed the jury that identity was a question of fact for the jury's determination, and that when "assessing reliability of identification," the jury could consider, among other things, "the level of certainty shown by the witness about his or her identification." After the trial in this case, this Court declared in *Brodes v. State*, 279 Ga. 435, 442 (614 SE2d 766) (2005), that it could "no longer endorse" the pattern jury instruction on the witness's "level of certainty," and "advise[d] trial courts to refrain from informing jurors they may consider a witness's level of certainty when instructing them on the factors that may be considered in deciding the reliability of that identification." The *Brodes* opinion evaluated whether giving the instruction in that case could be considered harmless error, and concluded it was not.

Conway contends that in her case, the instruction caused harm. Again, Conway characterizes Breedlove's testimony as demonstrating that he was confused as to the identity of Conway and Szatkowski, and asserts that the jury thus had to resolve his identification evidence under the "level of certainty" jury instruction. But, as noted

in Division 1, supra, the cited testimony does not demonstrate confusion between the individuals. At most, it shows uncertainty on Breedlove's part as to the ownership of the house. *Brodes* dealt with eyewitness identification of the defendant as the perpetrator when he was previously unknown to the witnesses. While harm in that case can be seen, Breedlove was well acquainted with Conway and Szatkowski, and the jury instruction complained of was not harmful. See *Dunson v. State*, 275 Ga. App. 515, 517 (2) (621 SE2d 525) (2005).

3. Conway urges that she did not receive effective assistance of trial counsel. In order to prevail on this claim, Conway must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to her defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of this test, she must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong, Conway must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of her trial would have been different. Id. at 783. " 'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

The only specific contention Conway raises is that counsel failed to interview witness Mora, and that had counsel done so, she would have discovered antagonism on Mora's part toward Conway, and been able to exploit it. During direct examination, Mora testified that she did not tell anyone about Conway's declaration until several years after the crimes were committed, when she was inquiring of the police if her driver's license was suspended; she also testified that she had no recollection of a later taped telephone conversation with Investigator Bunton about the murders. Counsel's cross-examination centered on the behavior of Bunton toward Mora and Conway in the days after the murders that counsel wanted Mora to characterize as "flirtatious" and "inappropriate."[3]

At the hearing on Conway's motion for new trial, Conway asked counsel about a report of an interview with Mora in which Bunton

---

[3] During Mora's discussion with Bunton about her driver's license, Bunton asked to see her tattoo, located on her left breast. Conway testified to a similar incident.

characterized Mora's statement as vindictive and speculative. Conway asked whether counsel had cross-examined Mora in relation to Bunton's conclusion. Counsel responded that a component of Conway's defense was that Bunton was persecuting Conway because she had rebuffed his sexual advances, and that she did not wish to ask Mora about the discussion with Bunton because it would emphasize to the jury that, at an earlier stage in the investigation than suited this theory, Bunton had information implicating Conway. Counsel also testified that she interviewed Mora before trial, and Mora declared that her statement was not vindictive, and Bunton's characterization of it as such was false. Thus, counsel testified that, although she knew of "bad blood"[4] between Mora and Conway, she also knew that Mora would testify that her 1995 statement to Bunton was true, and that she preferred that Mora's contention not be emphasized to the jury, and that she be able to argue that Bunton's notation that Mora's statement was vindictive was part of his effort to secure Conway as a sexual conquest. The trial court did not err in determining that counsel's actions regarding Mora were the result of reasonable trial strategy.

Conway makes unparticularized assertions that trial counsel was not prepared for trial and did not "put the State to proof," but offers no other specific instances reflecting counsel's alleged failure to prepare for trial. As noted above, Division 1, supra, the evidence presented by the State was sufficient to support the convictions. Finally, Conway claims that counsel erred in making an objection to the introduction of a statement that "misses the point," but Conway does not suggest what other objection might have been lodged, or why that objection would have been successful. The trial court was correct in finding that Conway did not meet either prong of the required test to establish ineffective assistance of counsel under *Strickland*, supra.

## Case No. S06A1650

4. Bates also asserts that the evidence was insufficient to convict him of malice murder. He notes what he contends are inconsistencies and discrepancies in the evidence, and the facts that Bates and his father, David, were estranged until shortly before the murders, and that both David and Breedlove had pled to other charges before their testimony. All the matters that Bates cites simply presented questions regarding conflicts in the evidence, or regarding credibility, which were properly for the jury's resolution. *Hampton v. State*, 272 Ga. 284 (527 SE2d 872) (2000). The evidence was sufficient to enable

---

[4] In testimony, Conway testified that the falling out "really wasn't major."

a rational trier of fact to find Bates guilty beyond a reasonable doubt of both malice murders. *Jackson*, supra.

5. The State introduced into evidence several photographs of the victims, depicting the injuries they suffered. First, Bates did not object to their admission, and any error in admitting the photographs is thereby waived. *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992). Second, although Bates characterizes these photographs as being taken after autopsy incisions, citing *Brown v. State*, 250 Ga. 862 (302 SE2d 347) (1983), the photographs were in fact taken before autopsy incisions. "Pre-incision photos such as the ones currently at issue which depict the location and nature of the victim's wounds are admissible because they are relevant and material." *Rucker v. State*, 270 Ga. 431, 433 (4) (510 SE2d 816) (1999). Several of the photographs showed gunpowder stippling on the victims' skin. While some of the photographs depicted the mutilation of the victims resulting from their wounds, and were graphic, that does not alter their admissibility. See *Joyner v. State*, 280 Ga. 37, 40 (4) (622 SE2d 319) (2005). Each of the photographs was relevant to some point of the forensic pathologist's testimony. See *Miller v. State*, 277 Ga. 707, 710 (2) (593 SE2d 659) (2004). Thus, the photographs were admissible.

6. Bates contends that the trial court set an unreasonable schedule, holding court late into the evening each day. After jury selection, the court announced all persons involved in the trial should be prepared "to open early and stay late," that court would begin at 9:00 a.m. each morning, and go into the evening as necessary.

The record reveals that Bates was represented by two attorneys, both of whom participated in his trial. Lead counsel for Bates objected on the record to a fast schedule, asserting that counsel would not have time to prepare for the next day's testimony. During the trial, neither of Bates's attorneys complained to the court that the court's schedule was, in fact, producing problems with the defense. The only assertion Bates made of a prejudicial effect flowing from the court's schedule was made at the motion for new trial when one of his attorneys testified that he became tired to the extent that he forgot a point he wished to make during closing argument; however, counsel also admitted that he had forgotten points of argument in cases that did not have a "rushed" schedule.[5] And, counsel testified that there was no witness he should have put on whom he did not, or that there were matters for cross-examination that he did not explore.

A "trial court retains the discretion to determine how late to hold court before recessing for the evening." (Citation and punctuation omitted.) *Hill v. State*, 263 Ga. 37, 38 (1) (b) (427 SE2d 770) (1993). In

---

[5] On the final day of trial, Bates's closing argument commenced shortly after noon.

*Hill,* the trial court recessed each day's proceedings between 6:00 p.m. and 8:00 p.m., after jury voir dire had gone until 11:00 p.m., and no abuse of discretion was found. Id. at 37. Here, court was recessed between 6:30 p.m. and 7:05 p.m. daily, until deliberations began. And as in *Hill,* Bates was represented by more than one attorney. Bates fails to show that the trial schedule was so oppressive as to leave counsel insufficient time to review each day's proceedings, or to prepare for the next day's, and there was no abuse of the court's discretion. See *Lynd v. State,* 262 Ga. 58, 59 (4) (414 SE2d 5) (1992).

7. Finally, Bates contends that he did not receive effective assistance of counsel at trial. Again, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith,* supra; *Strickland,* supra. In particular, Bates points to counsel's failure to object to the admission of certain photographs. As discussed in Division 5, supra, these photographs were admissible, and as the trial court found, counsel's failure to object cannot be a source of a claim of ineffective assistance of counsel.

Bates also renews his argument that the trial court's schedule caused one of his attorneys to be so tired that counsel forgot a point he wished to make during closing argument. See Division 6, supra. The argument point that counsel forgot was that, given the time line suggested by the State's evidence, it was unlikely that the defendants could have committed the murders, getting their clothes bloody, then gone to a tavern, where there was no report of bloody clothes, and then gone to Szatkowski's home, where Conway had stains on her shirt. But, as the trial court noted, evidence of the timing of all relevant events was before the jury, and thus the court did not err in determining that there was no reasonable probability that the outcome of Bates's trial would have been different if counsel had made this point during argument.

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 19, 2007.

*Randolph Frails,* for appellant (case no. S06A1649).
*Samuel W. Cruse,* for appellant (case no. S06A1650).
*Daniel J. Craig, District Attorney, Madonna M. Little, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Edwina A. Watkins, Assistant Attorney General,* for appellee.