306 Ga. 403
FINAL COPY

S19A0508.  EVANS v. THE STATE.

ELLINGTON, Justice.

A Tift County jury found Ruby Evans ("Appellant") guilty of conspiring with her son to murder her daughter-in-law, Sunday Blombergh, with an overdose of drugs and of committing malice murder as a party to her husband's subsequent acts of shooting, strangling, and stabbing Blombergh to death.[1] She appeals, contending that the evidence was insufficient to support her

[1] The murder occurred on April 22, 2010. On July 8, 2010, a Tift County grand jury indicted Appellant for malice murder, felony murder predicated on aggravated assault, aggravated assault, and conspiracy to commit murder (which conspiracy was alleged to have occurred on or about March 26, 2010). Appellant was not indicted with her co-conspirators, Theo Conoly and Herman Evans. Following a trial held on September 25-27, 2012, the jury found Appellant guilty on all counts. She was sentenced to serve life without parole for malice murder and to serve a consecutive ten-year term of imprisonment for conspiracy to commit murder. The trial court purported to merge the felony murder and aggravated assault convictions into the malice murder count. We note, however, that the felony murder count was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Appellant filed a timely motion for a new trial on October 2, 2012, which she later amended on October 4, 2017. Following a hearing, the trial court denied the motion on September 25, 2018. Appellant filed a timely notice of appeal, and her case was docketed in this Court for the April 2019 term and submitted for decision on the briefs.

convictions and that she was denied the effective assistance of trial counsel. Finding no error, we affirm.

1. Appellant contends that the evidence was insufficient to prove that she participated in Blombergh's murder. She argues that it showed that her husband, Herman Evans, was alone with Blombergh when he killed her, and that he was provoked to violence by Blombergh while arguing with her about her drug abuse. Evans pleaded guilty to murder and received a life sentence. Although Appellant admitted that she had wished Blombergh dead, she contends that her mere approval of Evans' crime was insufficient to hold her criminally liable.[2] For the following reasons, we disagree.

"Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a). As is relevant to this case, Appellant is

---

[2] Appellant does not specifically dispute the legal sufficiency of the evidence supporting her conviction for conspiracy to commit murder, which was based on acts committed by her and her son about a month prior to the murder. Nevertheless, as is this Court's practice in murder cases, we will also review the record and make a determination as to the legal sufficiency of the evidence supporting her conviction for conspiracy to commit murder.

2

concerned in the commission of a crime if she "(3) [i]ntentionally aids or abets in the commission of the crime; or (4) [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime." OCGA § 16-2-20 (b) (3), (4). Although mere presence at the scene of the crime or mere approval of a criminal act is insufficient to establish that a defendant was a party to the crime, a jury may infer from such evidence — as well as evidence of companionship and conduct before, during, and after the crime — that the defendant shared a common criminal intent with the one who performed the criminal act. See *Slaton v. State*, 296 Ga. 122, 124 (1) (765 SE2d 332) (2014) (A jury could reasonably infer from the evidence concerning defendant's conduct in calling his fellow gang members to retrieve him from an apartment where someone was threatening him, as well as his celebrating with them that evening after the shooting that enabled him to leave, that he was a party to the crime under OCGA § 16-2-20 (b) (4) by advising, encouraging, counseling, or procuring others to commit the shooting.).

When evaluating a challenge to the sufficiency of the evidence,

3

we view the evidence admitted at trial in the light most favorable to the verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *McGruder v. State,* 303 Ga. 588, 590 (II) (814 SE2d 293) (2018) ("Our limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." (citations and punctuation omitted)). So viewed, the evidence at trial showed that Theo Conoly (Appellant's son from a previous marriage) and Blombergh had a child together, I. C., who was born in February 2003. Toward the end of 2009, Conoly and Blombergh separated. Conoly moved to Tallahassee, Florida, and Blombergh and I. C. moved in with the Evanses in their Tift County home. Appellant disapproved of Blombergh's substance abuse and frequently complained that she was an unfit mother. She called Blombergh "lazy, selfish, conceited, and a horrible mom," and opined that her granddaughter would be better off without Blombergh. She wished that Blombergh would overdose and die. On a number of occasions,

4

Appellant "told," "ordered," or "screamed at" Evans to kill Blombergh. She said that if he loved her and I. C. and was "any kind of man," he would kill Blombergh to get her out of I. C.'s life.

In late March 2010, Conoly returned home from Tallahassee to visit his family. Conoly testified that, during a visit with Appellant at her Tifton flower shop, she asked him how much money it would take to buy a fatal drug overdose for Blombergh. Conoly told her it would take about $60. Appellant gave him the money and drove him to Blombergh's dealer. Conoly bought cocaine with the money, but instead of killing Blombergh with it, he and Blombergh used it together. Conoly testified, and Appellant admitted, that Appellant was "pissed" and disappointed with him for failing to execute their plan. Conoly later pleaded guilty to conspiracy to commit murder based on these events and was sentenced to serve three years in prison.

On March 27, Appellant called the police to report that her Jennings .22 caliber pistol had been stolen from the back room of her flower shop. Then, in the weeks leading up to the April 22 murder,

Appellant told her husband several times that she was tired of Blombergh's behavior and pressed him to "go ahead and get rid" of her and to get her out of their lives. Evans testified that, around noon on April 22, he entered his home and found Blombergh sitting on the living room couch, injecting herself with cocaine. According to Evans, he argued with the victim. He testified that the argument escalated and that he shot her in the back of the head with a .22 caliber pistol that he said he carried with him for work. After shooting Blombergh, he dragged her into her bedroom, believing that she was dead. He testified that he then drove to Appellant's flower shop to give Appellant Blombergh's cell phone. He asked Appellant whether she still wanted Blombergh dead and "if she could handle it" if he killed her. When Appellant said yes, Evans told her that the victim was already dead. He left the shop and returned home. When he entered Blombergh's bedroom, he found her sitting up against the bed, crying out for help. Evans testified that he wrapped an extension cord around her neck and attempted to strangle her. When that did not work, he went out to his truck to

6

retrieve his folding knife, and then returned and stabbed Blombergh in the heart with it.

Randy Tomlinson, a friend of Evans', testified that, on April 22, Evans asked him to buy some peroxide and bring it to him. Tomlinson took the peroxide to Evans' home and, upon entering the house, smelled a bad odor. Evans told him to take a look in the back bedroom. Tomlinson saw Blombergh's body lying on the floor next to the bed. Tomlinson asked Evans what he had done, and Evans said that Blombergh "had to die." Tomlinson helped Evans clean up the blood and dispose of the body in a wooded area. Tomlinson testified that, on many previous occasions, Evans had complained that Blombergh was an unfit mother and was only interested in doing drugs and partying. Tomlinson also heard Appellant say that she wanted to raise I. C. herself because Blombergh was an unfit mother.

According to Evans, when Appellant left work on the night of April 22, she went to a friend's house with I. C. to eat pizza. When she returned home, Evans asked her to check and make sure that

he had not missed anything when cleaning the house. Appellant cleaned up a blood spot on the couch and burned one of the throw pillows in the fireplace because it had blood on it. Evans and Appellant went through a box of ammunition and got rid of all of the .22 caliber short bullets they thought matched those he had used to shoot Blombergh. Appellant put the bullets in a potato chip bag and later threw them out on the side of the highway. Evans testified that he disposed of the gun that he used to shoot Blombergh by tossing it out of his truck and into a highway construction zone. He threw the knife away elsewhere. Evans later burned the couch that Blombergh had been sitting on when she was killed. Appellant also burned the blanket that Evans and Tomlinson had wrapped around Blombergh's body.

On April 24, Appellant reported Blombergh missing, telling the police that no one had heard from her since April 22. Appellant said that Blombergh was a cocaine addict and not fit to have custody of I. C. She also told the police that she had overheard Blombergh talking on the phone to her sister about going to Tallahassee.

Around April 24, Appellant called Conoly and told him that Blombergh had not been home in a few days, and she asked Conoly if Blombergh was with him in Tallahassee. A few days later, Appellant asked Conoly to sign a form giving her control over I. C.'s medical and educational decisions.

On April 26, Appellant agreed to meet with investigators looking into Blombergh's disappearance and to describe her last encounter with Blombergh. Appellant said that, on April 22, Blombergh had called her and asked her to buy some cigarettes. Appellant allowed the investigators to search her residence. They found Blombergh's cell phone charger in her bedroom, but they did not find her cell phone or purse. They also found a burn pile in the back yard. Pursuant to search warrants issued in May, investigators discovered remnants of the couch's frame in the burn pile, what appeared to be blood on the living room ceiling, and the victim's blood in the carpet in her bedroom.

In mid-May, Conoly returned to Tifton to visit his parents. While eating lunch with Conoly, Appellant told him that Evans had

"done it," that he had killed Blombergh. Conoly urged Appellant to call the police. She told Conoly that she could not turn Evans in because he had murdered Blombergh for her. Appellant told Conoly to take a few sentimental pieces of jewelry and her Jennings .22 caliber pistol from the flower shop. Conoly recovered the jewelry and the gun from where Appellant had hidden them, in an air-conditioning vent in the shop. Knowing that Conoly would report the murder, Appellant told Evans that "the jig was up." Evans tried to talk Conoly out of reporting the crime. When Conoly returned to Tallahassee, he called the Sheriff's Office in Tifton to report what Appellant had told him. Conoly later traded Appellant's pistol to one of his friends for drugs.

Not long after the murder, Appellant left Evans and moved in with Robert Price, who had at some point become her boyfriend. Price testified that investigators came to his house to question Appellant about Blombergh's disappearance. After they left, Appellant confessed to him that Evans had murdered Blombergh. She told him that Evans had called her at the flower shop on the day

of the killing and told her to come home because it was an emergency. When she got home, she found Blombergh sitting on the couch, injured and asking for help. According to Price, Appellant told Blombergh that there "wasn't anything that she could do for her." Evans gave Appellant some bullets to throw away, then he dragged Blombergh to the bedroom and stabbed her. Price also testified that, on a later occasion, he was at the flower shop with Appellant while Appellant was arguing with Evans on a speaker phone. Evans told Appellant that if he "went down" for the murder, she would go down with him because she had been present during the killing.

On May 26, investigators recovered Appellant's Jennings .22 caliber pistol in Tallahassee. When Appellant was questioned further, she confessed to having knowledge of Blombergh's murder. She admitted wishing that Blombergh was dead so that I. C. could be raised properly. She also admitted that Evans had come to her flower shop to tell her that he had killed Blombergh. She said that, although Evans had asked her to check to make sure that he had cleaned up well after the killing, she did not see anything amiss and

11

did not believe that her husband had really killed Blombergh until the next day, when she found a pillow with blood on it.

On May 27, Tomlinson confessed to his involvement in the crime. He took investigators to the place he and Evans had disposed of Blombergh's body. After a month in the woods, the victim's body had lost most of its soft tissue to decomposition and scavenging animals. The remains were delivered to the medical examiner in several paper bags. The medical examiner testified that the back of the skull had an entrance gunshot wound and that the skull contained a deformed .22 caliber bullet. The ninth rib on the left side of the torso had been fractured by blunt force. The medical examiner opined that the cause of death was a gunshot wound to the head. Given the decomposition of the body, the medical examiner was unable to determine whether the victim had also been strangled or stabbed. A ballistics expert testified that the .22 caliber bullet recovered from Blombergh's skull was too deformed to test for a match with a specific weapon; however, it could have been fired from Appellant's .22 caliber Jennings pistol.

Given this evidence, the jurors could infer that Appellant was motivated to kill Blombergh because she wanted custody of I. C. They could infer the requisite malicious intent for both conspiracy to commit murder and murder from Appellant's numerous statements encouraging, demanding, and soliciting Conoly and Evans to kill Blombergh. Contrary to Appellant's argument, there was sufficient evidence corroborating Evans' and Conoly's testimony.[3]

With respect to the crime of conspiracy, the jury could find that Appellant was guilty of conspiracy to commit murder in that she had devised a plan to kill Blombergh, had solicited and encouraged Conoly to carry out the murder, and had furthered the objective of the conspiracy by paying for and taking him to purchase the planned means of Blombergh's death, an overdose of cocaine.[4] With respect

---

[3] See *Ramirez v. State*, 294 Ga. 440, 442 (754 SE2d 325) (2014) ("[w]here, as here, more than one accomplice testifies at trial, the testimony of one accomplice may be corroborated by the testimony of the others" (citation and punctuation omitted)).

[4] OCGA § 16-4-8 provides that "[a] person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy . . ."

to the crime of murder, the jury could infer that Appellant aided Evans in killing Blombergh by making a false report that her .22 caliber pistol, the possible murder weapon, had been stolen weeks before the murder. Appellant also told her boyfriend that she had been present when the murder occurred. And the record is replete with evidence of Appellant's efforts to conceal the murder, from which the jury could infer both her participation in the crime and her guilty conscience. Given this evidence, the jury was authorized to find Appellant guilty as a party to the crime of murder.[5]

2. Appellant contends that her trial counsel's performance was deficient in three respects: (a) he failed to move the trial court for a

_____

[5] "A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). See, e.g., *Eller v. State*, 303 Ga. 373, 378-379 (II) (811 SE2d 299) (2018) (In the trial of two defendants, brother and sister, for the murder of the sister's boyfriend during an argument, the evidence was sufficient to support the sister's convictions of felony murder and aggravated assault because the brother had committed aggravated assault and murdered the victim, and both defendants worked together to conceal the death, dispose of his body, get rid of the murder weapon, destroy evidence, and lie. Further, the evidence of the sister's presence at the murder, her companionship with her brother, and her conduct before, during, and after the offense were sufficient to authorize a rational trier of fact to disbelieve her version of events and find that she aided and abetted her brother's crimes.)

14

change of venue; (b) he failed to object to the admission of photographs of the victim's remains; and (c) he failed to object to the admission of irrelevant "blood spatter" evidence. To prevail on a claim of ineffective assistance of counsel, Appellant must prove both deficient performance and resulting prejudice. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that her trial counsel performed in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690 (III) (A). To establish prejudice, Appellant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694 (III) (B). We need not address both components of this test if Appellant has failed to prove one of them. See *Walker v. State*, 301 Ga. 482, 489 (4) (801 SE2d 804) (2017).

(a) Appellant contends that media publicity surrounding Blombergh's disappearance and the subsequent murder

investigation was inherently prejudicial to her defense. Consequently, she argues, trial counsel was deficient for failing to move for a change in venue.

At the motion for new trial hearing, trial counsel testified that he had no recollection of the extent of pre-trial publicity surrounding the case. However, if the publicity had appeared significant to him, he testified that he would have considered filing a motion for a change of venue. Because trial counsel cannot be deficient for failing to file a meritless motion, Appellant must show that a motion to change venue "would have been granted had counsel made the motion." (Citation omitted.) *Mims v. State*, 304 Ga. 851, 858-859 (2) (c) (823 SE2d 325) (2019). "To prevail on a motion to change venue, a defendant must show either that (1) the setting of the trial was inherently prejudicial or (2) the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." (Citation omitted.) Id. at 859 (2) (c). Appellant cannot make the first showing, because she failed to present evidence establishing that publicity was widespread or that it "contained information that was unduly

16

extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." (Citation and punctuation omitted.) Id.

Appellant also has not established that any pre-trial publicity resulted in actual prejudice in this case. In denying the motion for new trial on this allegation of deficient performance, the trial court found the following:

> [J]ury selection began with the Court qualifying the entire body of jurors summonsed for jury duty as to relationship and the statutory questions. Three persons responded affirmatively to the statutory questions, but none of those jurors were included in the forty four jurors identified from which the jury would be selected. During the jury selection process, four jurors in the first thirty were disqualified for cause, but three of the four were disqualified due to reasons unrelated to pretrial publicity, bias or impartiality concerns regarding the case. Only one potential juror expressed concerns about being impartial resulting in disqualification. The jury was then selected from a panel of thirty qualified jurors, none of which had demonstrated any prejudice toward the [Appellant], although some of the jurors may have read or heard something about the case.

The transcript of the jury selection process supports the trial court's findings. Of the jurors seated, four had read newspaper articles about the murder, but each recalled little, if anything, of what they

17

had read. They each affirmed that they could be fair and impartial. Given this evidence, Appellant cannot establish actual prejudice in the jury selection process given that "the key question in this context is whether those jurors who had heard about the case could lay aside their opinions and render a verdict based on the evidence." (Citation and punctuation omitted.) *Mims*, 304 Ga. at 859 (2) (c). Because Appellant has failed to show a reasonable probability that a motion to change venue would have been meritorious, she cannot establish that trial counsel was deficient for failing to file the motion. See id.

(b) Appellant contends that trial counsel was deficient for failing to object to the admission of several "post-autopsy" photographs of the victim on the ground that they were gruesome, irrelevant, unduly inflammatory, and admitted without proper authentication.[6]

---

[6] Appellant was tried before the January 1, 2013 effective date of Georgia's new Evidence Code. Consequently, we apply the case law then applicable to this claim of error. We note, however, that

> [u]nder our new Evidence Code, the general admissibility of autopsy photographs is governed by OCGA § 24-4-401, which defines "relevant evidence" as "evidence having any tendency to

In denying the motion for new trial on this claim of ineffective assistance of counsel, the court found that the victim's body consisted of skeletal remains with a small amount of connective tissue. The medical examiner "conducted a visual examination of the bones" in determining the cause of death. No soft tissue was incised and no organs were removed as none remained for a traditional autopsy. The photographs of the victim's remains were authenticated by the medical examiner and used to illustrate his findings. The court further determined that the probative value of the photographs in showing bullet holes and fractures was not

---

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"; OCGA § 24-4-402, which provides that "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules"; and OCGA § 24-4-403, which provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Decisions regarding relevance are committed to the sound discretion of the trial court and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly.

(Citations and punctuation omitted.) *Venturino v. State*, 306 Ga. 391, 394-395 (2) (b) (830 SE2d 110) (2019).

substantially outweighed by any prejudice caused by their alleged gruesomeness.

While the photographs depicted the victim's skeletal remains and were, therefore, somewhat graphic, that does not alter their admissibility because each of the photographs "was relevant to some point of the [medical examiner's] testimony." *Conway v. State,* 281 Ga. 685, 691 (5) (642 SE2d 673) (2007). See also *Klinect v. State,* 269 Ga. 570, 574 (4) (501 SE2d 810) (1998) ("Photographs showing the condition and location of the victim's body are admissible where alterations to the body are due to the combined forces of the murderer and the elements." (citations omitted)). Because the photographs would have been admissible over counsel's objection, counsel was not deficient for having made no objection. See *Smith v. State,* 300 Ga. 532, 536-537 (3) (b) (796 SE2d 671) (2017) ("Deficient performance is not shown by counsel's failure to raise a meritless objection." (citation omitted)).

(c) Appellant also argues that counsel was deficient for failing to object to "irrelevant evidence" of what appeared to be blood

spatter on the walls of her living room. The record shows that counsel had no objection to the introduction of a series of photographs of the crime scene. Two of the photographs depicted several small stains on the living room wall. The investigator who identified the photographs testified that he performed field tests on the stains and determined that they were "negative for blood." In its order denying Appellant's motion for a new trial, the trial court concluded that the photographs did not contain evidence that was prejudicial to the defense. We agree. Moreover, we note that "photographs of a crime scene offered to show how it existed when authorities arrived are generally admissible." (Citation omitted.) *Banta v. State*, 282 Ga. 392, 396 (3) (651 SE2d 21) (2007). Given that a trial court has broad discretion in balancing the probative and prejudicial nature of crime scene photographs, see id., the trial court in this case would have been authorized to overrule an objection to these photographs had counsel objected. Therefore, counsel was not deficient for failing to make a meritless objection. See *Smith*, 300 Ga. at 536-537 (3) (b).

For these reasons, the trial court did not err in denying Appellant's claims of ineffective assistance of trial counsel.

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 5, 2019.

Murder. Tift Superior Court. Before Judge Cross.

*Conger & Smith, Gregory D. Smith*, for appellant.

*C. Paul Bowden, District Attorney, Jason M. Rea, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.